### In re M & F WORLDWIDE CORP. SHAREHOLDERS LITIGATION.

#### Civ. A. No. 18502.

Court of Chancery of Delaware, New Castle County.

Submitted: May 10, 2002.
Decided: May 13, 2002.

Norman M. Monhait, of Rosenthal, Monhait, Gross & Goddess, Wilmington, Delaware; John F. Harnes and Gregory E. Keller, of Harnes Keller, New York City; Garwin Bronzaft Gerstein, New York City, Wechsler Harwood Halebian & Feffer, New York City, the Brualdi Law Firm, New York, City, of counsel, for Participating Plaintiffs, of counsel.

Thomas J. Allingham II, Randolph K. Herndon, and Douglas E. McCann, of Skadden, Arps, Slate, Meagher & Flom, Wilmington, Delaware; Robert E. Zimet, Susan L. Saltzstein and Sharon Garb, of Skadden, Arps, Slate, Meagher & Flom, New York City, of counsel, for Defendants Ronald Perelman, Howard Gittis, Mafco Holdings Inc. and Mafco Consolidated Group, Inc.

Jon E. Abramczyk, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; Morvillo, Abramowitz, Grand, Iason & Silberberg, New York City, of counsel, for Defendants Jaymie Durnan, Theo Folz, J. Eric Hanson, Bruce Slovin, Stephen Taub, and M & F Worldwide Corp.

David L. Finger, of David L. Finger, P.A., Wilmington, Delaware; Paul J. Dobrowski, of Dobrowski & Associates, Houston, TX; William C. Rand, of Law Office of William Coudert Rand, New York City, of counsel, for Defendants Furtherfield Partners, L.P., Robotti & Company, Inc., and Ravenswood Investment Company, L.P.

Thad J. Bracegirdle, of Richards, Layton & Finger, Wilmington, Delaware; Kramer Levin Naftalis & Frankel, New York City, of counsel, for Defendants Paul M. Meister, Edward G. Hookstratten, and Lance Liebman.

## OPINION

STRINE, Vice Chancellor.

The present motion comes before me as a result of a proposed settlement in this case, which involves a challenge to the purchase of defendant Mafco Holdings, Inc.'s ("MAFCO") 83% stake in Panavision, Inc. by M & F Worldwide Corp. ("MFW"). MAFCO is owned by defendant Ronald O. Perelman, who through MAFCO also owned 35% of MFW before the Panavision transaction. The central allegation of the plaintiffs' case is that the purchase was unduly favorable to MAFCO, to the unfair detriment of MFW and its public stockholders.

Following the first week of trial in that action, plaintiffs Kimberly Kahn, Robert Struogo, and Harbor Finance Partners (collectively, the "Participating Plaintiffs") entered into a Stipulation of Settlement with defendant MAFCO and defendant members of the MFW board of directors.

That settlement is opposed by plaintiffs Furtherfield Partners, L.P., Robotti & Co., Inc., and Ravenswood Investment Co., L.P. (collectively, the "Objector Plaintiffs" or "Objectors"). All of the Participating and Objector Plaintiffs were named plaintiffs in complaints filed in this consolidated action. From its inception, this action has been primarily a derivative action, with other ancillary claims pled as class claims. In this regard, the principal remedy sought by all plaintiffs from the start was rescission, a remedy tied to the core derivative claim of unfair dealing.

In this motion, the Objectors have moved to disqualify the five plaintiffs' law firms (the "Participating Firms") participating in the stipulation of settlement, on grounds of conflict of interest. That is,

the Objectors contend that the Participating Firms cannot ethically support a settlement of this action when that settlement is opposed by the Objectors.

In this opinion, I deny the Objectors' motion to disqualify. Because this case was pled as a representative action from the beginning, the duties of the Participating Firms were to MFW and its public stockholders generally, and not particularly to the named plaintiffs. By choosing to file a representative action, the named plaintiffs sought to utilize the greater leverage of representing MFW and others to obtain relief beneficial to themselves. Therefore, the named plaintiffs assumed a different relationship with their counsel than exists in an individual action. In a representative action of this sort, plaintiffs' counsel is required to act in the best interests of the company and its public stockholders, and is entitled to present a settlement in good faith – even if that settlement is opposed by some of the named plaintiffs – so long as plaintiffs' counsel discloses that there is dissension among the plaintiffs' ranks and helps the court implement a process whereby the dissenters may present their views to the court. Here, the Participating Firms promptly informed the court of the Objectors' opposition to the proposed settlement, and helped the Objectors find counsel to present their objections. Therefore, the Objectors face no prejudice from the Participating Firms' presentation of the settlement. By contrast, disqualifying the Participating Firms would leave MFW and the public stockholders with no champion to present the proposed settlement. The interests of justice are therefore best served by denying the Objectors' motion.

## I. *Factual Background*

### A. *MAFCO Proposes That MFW Acquire Its Stake In Panavision, Generating Several Derivative Suits*

MFW is the world's largest producer of licorice flavoring, primarily for use by the tobacco industry. Although MFW's growth prospects are apparently limited, as of the autumn of year 2000, the company had little debt and excellent cash flows. When the underlying dispute began in November of 2000, control of MFW allegedly rested in the hands of defendant Perelman. Perelman is the sole shareholder of MAFCO,[1] which owns 35 percent of the shares of MFW. In addition, eight of the eleven members of MFW's board then in place were current or former employees of entities controlled by Perelman.

In 1998, MAFCO acquired its supermajority interest in Panavision, a company that designs and manufactures high-end camera lenses for the movie industry. After a couple of years of rising debt and allegedly poor performance at Panavision, MAFCO proposed that MFW acquire its 83% stake in Panavision for $190 million, or $26 per share, plus a to-be-negotiated premium in November, 2000. Even without the premium, the price MAFCO sought was quadruple the price at which Panavision's minority shares then traded in the public markets. Not only that, Panavision was stumbling under a heavy debt burden, which its own cash flows could not service, posing a risk that the company would become insolvent in the very near future.

The proposed Panavision deal spawned a multitude of suits *on behalf of MFW* seeking an injunction to prohibit consummation of the deal, as well as damages. That proposal, alleged the derivative complaints,

---

1. MAFCO is a short-hand reference for various entities wholly owned on an indirect basis by Perelman.

was merely a self-dealing scheme to benefit Perelman at the expense of MFW shareholders. That is, Perelman allegedly sought to obtain badly needed cash from MFW on unfair terms to secure his investment in Panavision, which threatened to become extinct if the latter company went into bankruptcy.

The first entity to file a derivative suit was Objector Furtherfield, which at the time of filing claimed to own more than 55,000 MFW shares. Its complaint, dated November 14, 2000, was brought on behalf of MFW against Perelman and the other members of the MFW board of directors. The action was filed by the New York firm of Harnes Keller, L.L.P. ("Harnes Keller"), with Rosenthal Monhait Gross & Goddess ("Rosenthal Monhait") serving as Delaware counsel.[2]

Other derivative claims followed. On November 28, 2000, Objectors Robotti and Ravenswood together brought an action against the MFW board seeking essentially the same relief as Furtherfield.[3] At the time of filing, Rabotti and Ravenswood were represented by the Law Office of J. James Carriero of East Elmherst, New York, and in Delaware by Rosenthal Monhait.

Three additional shareholders with smaller holdings also entered the fray after announcement of the Proposed Transaction. On November 17, 2000, Participating Plaintiff Kahn, represented by Garwin Bronzaft Gerstein & Fisher, LLP of New York ("Garwin Bronzaft") and Rosenthal Monhait in Delaware, filed a derivative suit.[4] Three days after Kahn's filing, Participating Plaintiff Struogo, represented by Wechsler, Harwood, Halebian & Feffer,

LLP, of New York ("Wechsler Harwood") and Rosenthal Monhait in Delaware, also filed suit on behalf of MFW.[5] On November 27, 2000, Participating Plaintiff Harbor Finance, represented by The Brualdi Law Firm of New York ("Brualdi") and in Delaware by Rosenthal Monhait, brought a similar action.[6] Kahn, Struogo, and Harbor Finance collectively own less than 1,000 MFW shares.

While the timing of the filing of the derivative actions differed slightly, the plaintiffs were in full agreement as to the appropriate relief. In each instance – in language so similar as to be almost boilerplate – the plaintiffs sought the same two remedies: an order enjoining consummation of the deal, as well as an award of damages to compensate MFW for any loss it had suffered as a result of the proposed transaction and the defendants' alleged breaches of fiduciary duty.[7]

B. *The Panavision Transaction is Consummated, Giving Rise to Class Action Claims and Consolidation by the Court; the Vannini Complaint Is Filed*

Meanwhile, on November 21, 2000, the MFW board of directors created a special committee consisting of three putatively independent directors. The committee deliberated for several months, and on April 19, 2001, MFW announced the purchase of PX Holding's entire block of Panavision common stock at $17.75 per share (the "Panavision Transaction"). Taking into account its prior MFW stock ownership, the Transaction resulted in MAFCO obtaining indirect control of approximately 53 percent of MFW's voting stock. In

---

2. C.A. No. 18502–NC.

3. C.A. No. 18528–NC.

4. C.A. No. 18511–NC.

5. C.A. No. 18515–NC.

6. C.A. No. 18525–NC.

7. *See* Furtherfield Compl. at 8; Kahn Compl. at 8; Struogo Compl. at 8; Harbor Fin. Partners Compl. at 8; Robotti/Ravenswood Compl. at 8.

conjunction with the Transaction, Perelman and MFW also executed a "keepwell" letter, under which Perelman and the entities he owned agreed to pay certain existing Panavision debt obligations if, in the good-faith judgment of the MFW board, Panavision itself could not meet them. In exchange, Perelman would receive certain consideration spelled out in the keepwell letter, which was on terms more favorable to MFW than could be achieved in the equity or debt markets.

On April 25, 2001, Furtherfield filed an amended complaint (the "Furtherfield Amended Complaint"), asserting three claims arising out of the Panavision Transaction.[8] Count I asserted a derivative claim for breach of fiduciary duty in connection with Perelman's alleged self-dealing and the board's failure to ensure that the Panavision Transaction was entirely fair. In Count II, a claim was asserted both individually *and on behalf of the class of all MFW shareholders* alleging dilution of stock ownership and voting rights. Count III, also a class action and an individual claim, asserted in the alternative that to the extent Perelman was not already the controlling shareholder of MFW before the Panavision Transaction, its effectuation transferred control to him, triggering *Revlon*[9] duties on the part of the defendants. The defendants, asserts the Amended Complaint, breached those duties by failing to maximize shareholder value in connection with that alleged transfer of control.

The Furtherfield complaint, however, was not intended in any way to be solely a pleading on behalf of Furtherfield. While Counts II and III of the Amended Complaint rather cursorily asserted "individual" claims, the complaint also sought certification of a class of all MFW stockholders other than the defendants and their affiliates as to those counts. The fact that the Furtherfield Amended Complaint seeks rescissory damages on behalf of MFW,[10] as well as "an order certifying Counts II and III of this action as class claims on behalf of the class,"[11] clearly suggests that Furtherfield (and the other named plaintiffs) did not intend to litigate those claims solely for their own benefit.

This reality was made even more clear the next day. On April 26, 2001, at all of the plaintiffs' urging, the court issued an Order consolidating all of the pending cases under the caption *In Re MFW Worldwide Corp. Shareholders Litig.*, Consolidated Civil Action No. 18502–NC (the "Consolidated Action"). That Order of Consolidation made the Furtherfield Amended Complaint the operative complaint in the Consolidated Action – that is, for the plaintiffs in all the consolidated cases. In its order, the court also designated Harnes Keller as plaintiffs' lead counsel, and Rosenthal Monhait as Delaware liaison counsel. The Order also established a Plaintiffs' Committee of the Whole comprised of Harnes Keller, Garwin Bronzaft, Wechsler Harwood, Brualdi, and Lowey Dannenberg.[12]

---

**8.** PX Holding is no longer a party to these proceedings.

**9.** *See Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del.1986).

**10.** Am. Cl. Action Compl. at 19. The Amended Complaint seeks such damages without specifying who was to receive them. Because MFW was party to the Panavision Transaction, it seems obvious that such damages would go to it.

**11.** *Id.*

**12.** Lowey Dannenberg later withdrew from the case. The day after the court issued its Order of Consolidation, shareholder Jonathan P. Vannini filed an *individual* claim challenging the Panavision Transaction. That action, *Vannini v. Perelman*, C.A. No. 18850–NC, was later settled when MFW purchased Vannini's one million shares of MFW stock for $10 million, plus up to $1 million in legal fees.

### C. The Consolidated Action Proceeds to Trial; the Participating Plaintiffs and Defendants Forge a Stipulation of Settlement

The case moved rapidly to an expedited trial so that plaintiffs could press for rescission while that remedy remained practicable. After exhaustive and intensive discovery, trial in the Consolidated Action began on January 14, 2002 and continued through January 18. The trial was to resume on Monday, January 28; in the interim week, however, settlement negotiations ensued. While the Objector Plaintiffs (i.e., Furtherfield, Robotti, and Ravenswood) claim that they were not informed that those negotiations were taking place, the weight of the record evidence is heavily to the contrary and strongly suggests that the plaintiffs' lead counsel regularly consulted with the Objectors.[13] Indeed, Furtherfield's principal officer, Daniel Breen, admitted in recent testimony that he was personally kept apprised of settlement negotiations by trial attorneys from Harnes Keller *before, during, and after trial*.[14] At the very least, it is safe to say that Breen was informed of the possibility of a settlement no later than Friday, January 18, 2002.[15]

On January 25, 2002, the Participating Plaintiffs and Firms reached an agreement in principle to settle the case. Two days later, the Participating Firms and defendants' counsel informed the court of the proposed agreement, and obtained an adjournment of trial. At that time, the Participating Firms advised the court that the Objector Plaintiffs would likely oppose the settlement. Demonstrating its knowledge of the key terms of the proposed agreement, Furtherfield (through Breen) sent the court a letter on January 28, 2002, adamantly objecting to the proposed agreement.[16]

Despite the likely objections of Furtherfield and the other Objectors, the Participating Plaintiffs and Firms entered into a Memorandum of Understanding ("MOU") with the defendants on February 7, 2002. On February 21, 2002, the Participating Plaintiffs entered into a formal Stipulation of Settlement with all the defendants.

That Stipulation provides for, among other things, the establishment by defendants (but not MFW itself) of a $12 million Settlement Fund.[17] Any holders of MFW common stock on April 19, 2001 who continue to hold shares through the date of the Settlement Hearing (except defendants and Perelman affiliates) would be entitled to cash consideration in the amount of the lesser of (i) $2.15, multiplied against the shareholder's "Qualifying Shares" (i.e., those of MFW common stock for which valid claims have been submitted), or (ii) $12 million divided by the shareholder's "Valid Claims Number" (i.e., the number of shares of MFW common stock held by the shareholder).[18] Any shares of MFW stock sold between April 19, 2001 and the settlement hearing would be excluded from these payments; that is, only shares held continuously by the same holders between

---

On October 16, 2001, the Consolidated Action plaintiffs filed another derivative action, C.A. No. 19203–NC, alleging, among other things, that the settlement of the Vannini case was unfair to MFW and its shareholders.

**13.** See generally Keller Aff. *passim; see also* Cibelli Dep. 86–88, 125–27 (admitting he discussed settlement proposals in mid-January, 2002 with plaintiffs' lead trial counsel), Robotti Dep. 34–35 (same); Breen 5/2/02 Dep. at 241–43, 255–58, and 290–92 (same).

**14.** See Breen 5/2/02 Dep. at 241–43, 255–58, and 290–92, respectively.

**15.** See *id.* at 26–28, 184–87; Breen Aff. at 2.

**16.** The terms of the settlement, said Breen, "are totally unacceptable ... [I]f this transaction is accepted ... it will clearly lower the bar for corporate governance in the future and thus open Pandora's box for corporate thievery." Breen 1/28/02 Ltr. at 1.

**17.** Stipulation of Settlement ¶ 7.

**18.** *Id.* ¶¶ 7, 8.

April 19, 2001 and the settlement hearing carry with them the $2.15 right.

The Proposed Settlement also has two other features. The first is that it modified the "keepwell" agreement between Perelman and MFW to confer MFW's decision-making authority under that agreement to a special committee of its independent directors. The second notable feature of the Proposed Settlement is that it entitles MFW the right to buy $37.7 million in Panavision notes from MAFCO and its affiliates at a steep discount to market.

In exchange for these benefits, the Class Plaintiffs would agree to settle not only the Consolidated Action,[19] but also any potential claims arising out of the purchase, by certain defendants or their affiliates, of publicly traded Panavision 9 5/8 percent Senior Subordinated Notes (the "Panavision Note Claims"). Under the Stipulation, all parties "shall make best efforts to obtain the dismissal of the Consolidated Action ... with prejudice as to all defendants and against the plaintiffs and all members of the Class."[20] Further, the Stipulation provides that the defendants will not object to a request by the Participating Firms for $2.75 million in attorney's fees.[21]

D. *The Court Orders That for Purposes of Settlement, the Consolidated Action Shall Proceed as a Class Action; The Objector Plaintiffs Move to Disqualify the Participating Firms*

The period after the Stipulation of Settlement was entered did not pass altogether smoothly. The Objectors made their opposition to the Proposed Settlement plain, as well as their ire with the Participating Firms. Nonetheless, a schedule was set to permit the Objectors to find new counsel, who would have adequate time to present an objection to the Proposed Settlement as well as a motion for the Objectors to be named as class representatives.

To facilitate a determination on these issues, this court issued an Order setting the date for a settlement hearing for May 13, 2002. That Order, among other things, held that "[f]or purposes of this settlement only, and preliminarily, for purposes of this Order, the Consolidated Action shall be maintained and proceed as a class action, pursuant to Rules 23(a), 23(b)(1), and 23(b)(2) of the Rules of Court, without the right of Class members to opt out."[22] Further, the Order designated (as a preliminary matter) the Participating Plaintiffs as Class representatives on behalf of all persons or entities who held MFW common stock from April 19, 2000 through the date of the settlement hearing, other than the defendants and affiliates of Perelman. The Order also designated Harnes Keller as the Participating Plaintiffs' lead counsel, and Rosenthal Monhait as Participating Plaintiffs' liaison counsel.

II. *The Basis For The Objectors' Motion To Disqualify*

The Objector Plaintiffs were able to procure new counsel to present their objections and other motions.[23] Through their

---

19. Under the Proposed Settlement, the Vannini Settlement Action would be settled as well.

20. *Id.* ¶ 12(a).

21. Stipulation of Settlement.

22. 3/4/02 Order at 2.

23. The new attorneys for Furtherfield, Robotti, and Ravenswood who collectively filed this Motion are David L. Finger of David L. Finger, P.A., Wilmington, Delaware; Paul J. Dobrowski of Dobrowski & Associates, L.P., Houston, Texas; and William C. Rand, The Law Offices of William C. Rand, New York, New York.

counsel, they have filed this motion to disqualify the Participating Firms. The premise for the motion is based on the assertion that the Proposed Settlement is "unacceptable to [the Objector] Plaintiffs." [24] Since, the Objectors say, no class had been certified as of the time of the Stipulation of Settlement, the Participating Firms were bound to treat the Objectors as if they were pressing solely individual claims. Because the Objector Plaintiffs had voiced their disapproval regarding the proposed settlement, and because the Participating Firms "knew their clients' position yet continued to act in direct violation of the [Objector] Plaintiffs' directives and best interests," [25] the Participating Firms allegedly breached their fiduciary duties to the Objector Plaintiffs and "ignored the conflict of interest they created when negotiating and advocating a settlement against their clients['] wishes" [26] when they chose to align themselves with the Participating Plaintiffs. Thus, the Objector Plaintiffs argue that the Participating Plaintiffs' attorneys violated Delaware Rules of Professional Conduct ("DRPC")

1.2, 1.7, and 1.9, and should be disqualified.[27] Further, they argue that under DRPC 1.10, the disqualification of these attorneys must be imputed to their respective firms.

As a secondary argument, the Objectors contend that the Participating Firms' alleged failure to consult adequately with the Objectors before deciding to support the Proposed Settlement is, in itself, adequate grounds for disqualification.

I now explain why I reject each of these arguments.

III. *The Participating Firms' Support for a Settlement Opposed by the Objectors Does Not Support Their Disqualification in the Absence of Unfair Prejudice to the Objectors*

The Objectors' motion fails primarily because it seeks to import rules designed for individual actions into the very different realm of representative litigation. There is no question that the Participating Firms could not seek to settle this case if the case involved claims solely seeking relief for the Objectors.[28] But this is not that sort of

---

24. Pl. Op. Br. in Support of Mot. to Disqualify Counsel at 2.

25. *Id.* at 3.

26. *Id.* at 4.

27. DRPC 1.2(a) states that a lawyer "shall abide by a client's decisions concerning the objectives of representation ... [and] shall abide by a client's decision whether to accept an offer or settlement of a matter." Rule 1.7 is the general conflict-of-interest provision prohibiting lawyers from representing clients with interests "directly adverse" to another client, unless the lawyer reasonably believes the representation will not adversely affect the relationship with the other client, and each client consents. Rule 1.9 is the conflict-of-interest provision prohibiting an attorney who has formerly represented a client in a matter, absent consent, from representing another client in the same or substantially related matter "in which that person's interests

are materially adverse to the interests of the former client." DRPC 1.9(a).

28. The highly qualified experts for the defendants and the Participating Firms agree that this is so. The parties have presented this court with expert affidavits by distinguished professors, who specialize in legal ethics: Professor Bruce A. Green (for the Participating Firms); Professor Geoffrey C. Hazard, Jr. (for the Objectors); and Professor Charles W. Wolfram (for the defendants). For the most part, they all agree on the relevant law. The Objectors' expert, Professor Geoffrey Hazard, has, however, based his opinion on a set of facts given to him by the Objectors. These facts are, in key respects, at odds with the record. In particular, Professor Hazard assumes that this action has proceeded in an important way as an individual matter on behalf of the Objectors, rather than primarily as a derivative suit, and secondarily as a proposed class action. But Professor Hazard admits that it is ethical for counsel in a derivative and/or class action to recommend a set-

case at all.

■ From the start, all of the plaintiffs, including the Objectors, stated representative claims. In particular, the plaintiffs sought to represent MFW in a derivative capacity. Therefore, the initial complaints all sought as their primary relief either an injunction to stop the Panavision Transaction from occurring, or rescission if it was consummated. Secondarily, the initial complaints sought monetary damages to *MFW*.

As a result, the Objectors' disavowal of the representative nature of this case is, to put it as mildly as possible, mistaken. And none of the later pleadings changed the representative nature of the case. At most, those later pleadings added the additional representative feature that the plaintiffs were also seeking relief on behalf of a class of MFW stockholders, other than the defendants, and other MAFCO affiliates. The relief that was sought in connection with these class claims was, however, no different from that sought by prosecution of the derivative claims: the plaintiffs – especially the Objectors – principally sought rescission, or damages to MFW.[29]

■ The nature of all the plaintiffs' claims is important. Having stated derivative claims on behalf of MFW, the plain-tiffs and their counsel took on a responsibility to act in the best interests of MFW, and not just themselves. This reality is reflected in the requirement that any dismissal of the complaints had to be approved by the court, per Court of Chancery Rule 23.1.[30] The reason for this requirement is to avoid collusive settlements, whereby particular plaintiffs use the leverage of a derivative action to obtain preferential payments for themselves in exchange for a settlement leaving the company and its other stockholders with less value or nothing at all.

Here, the Objectors' contention that they were not pressing a representative action is made hardest to embrace by the premise of their objection to the Proposed Settlement. In the Objectors' view, the Panavision Transaction was so egregious that only a remedy of rescission would make MFW and its public stockholders whole.

Were they seeking only to advance their own interests, however, it is difficult to conceive how the Objectors could obtain rescission. Such a remedy would have profound effects on MFW and all of its public stockholders, and would involve the undoing of a contract to which MFW was a direct party. That is, an order of rescission would be the classic example of an

tlement in good faith even if the named plaintiff objects. Hazard Aff. ¶ 15.

Likewise, Professor Hazard's assumption that the Participating Firms did not consult with, and "indeed conducted the settlement negotiations entirely behind the backs" of the Objectors, Hazard Aff. ¶ 17, is directly at odds with the most reliable record evidence, including the deposition testimony of Breen, Robotti, and Cibelli.

29. Although not determinative, it is revealing of the nature of this case that none of the Objectors was bearing the freight for this litigation in the manner that would be expected had they decided to press their claims solely as an individual matter. It appears that the costs of the litigation were borne entirely by the Participating Firms, and that no hourly fees were paid to those Firms. One doubts that this arrangement would have been acceptable to those Firms if the Objectors were not pressing a representative action on behalf of MFW and a proposed class of its public stockholders.

30. *See, e.g., Good v. Texaco*, 1985 WL 11536, at *11 (Del.Ch.) ("[B]ecause of the fiduciary character of a class or derivative suit, the Court is required to participate in the consummation of the settlement of such an action to the extent of determining its fairness to the rights of the parties whose interests will be thereby affected.").

**1174** ■■■■■■■■

equitable remedy awarded on a meritorious derivative claim of unfair dealing.

■■ From the start, therefore, the Objectors' most central claim of unfair dealing belonged to MFW, not to them individually.[31] Similarly, their class claims were filed on behalf of all MFW stockholders unaffiliated with the defendants or MAFCO. Although it is regrettable that the issue of class certification was not resolved before trial,[32] that factor does not diminish the reality that the Objectors were pressing the case as a class action, and thereby had assumed a duty to those on behalf of the proposed class whose interests they sought to vindicate.[33] By assuming unto themselves the leverage that came with the pleading of class claims, the plaintiffs – and their counsel – also accepted a responsibility to act on behalf of the proposed class with fidelity.[34]

■■ Concomitant with this responsibility, the named plaintiffs gave up the right to dictate the outcome of the action unilaterally.[35] Instead, any resolution of the

---

**31.** As stated by Vice Chancellor Jacobs in *In re MAXXAM, Inc./Federated Dev't Shareholders Litig.*:

> A derivative claim belongs to the corporation, not to the shareholder plaintiff who brings the action. The shareholder plaintiff's interest is limited to compelling the corporation (by 'standing in its shoes') to assert the corporation's right to seek redress for the alleged wrongdoing. The stockholder plaintiff's claim for redress in a derivative action is not personal. It is derivative, and exists solely because of the plaintiff's interest as a shareholder. Because the corporation is always the real party in interest, the identity of the specific representative shareholder plaintiff is not a paramount concern.

698 A.2d 949, 956 (Del. Ch.1996) (internal citations omitted).

**32.** I accept my share of the responsibility for that failure, and should have required counsel to address this facet of the case before proceeding to trial. In any event, because the case centered on a demand for rescission, the parties already knew that any judgment in the derivative action would bind MFW and its stockholders regarding whether the Panavision Transaction involved any unfair dealing, and the appropriate remedy therefor.

**33.** Put simply, "[t]he duty owed by class counsel is to the entire class and is not dependent on the special desires of the named plaintiffs." *Parker v. Anderson*, 667 F.2d 1204, 1211 (5th Cir.1982); *see also Roper v. Consurve*, 578 F.2d 1106, 1110 (5th Cir.1978).

**34.** By now it is well established that by asserting a representative role on behalf of a proposed class, representative plaintiffs and their counsel voluntarily accept a fiduciary obligation towards members of the putative class. Such a fiduciary obligation exists even before the class has been certified. According to the Manual for Complex Litigation,

> By its nature, litigation in which claims are made by or against a class tends to be complex and require judicial management ... Once class allegations are made, various otherwise routine decisions such as whether to compromise the action or abandon the class claims – are no longer wholly within the litigants' control. The attorneys and parties seeking to represent the class assume fiduciary responsibilities, and the court bears a residual responsibility to protect the interests of class members, for which Rule 23(d) gives the Court broad administrative powers.

FEDERAL JUDICIAL CENTER, MANUAL FOR COMPLEX LITIGATION § 30 at 31–32 (3d ed.1995); *see also Roper*, 578 F.2d at 1109 ("By the very act of filing a class action, the class representatives assume responsibilities to members of the class."); *Caston v. Mr. T's Apparel, Inc.*, 157 F.R.D. 31–33 (S.D.Miss.1994) ("[I]t is well established that by asserting a representative role on behalf of a class, representative plaintiffs voluntarily accept a fiduciary obligation towards members of the putative class.").

**35.** *See Pettway v. Am. Cast Iron Pipe Co.*, 576 F.2d 1157, 1176 (5th Cir.1978) ("[W]hen a potential conflict arises between the named plaintiffs and the rest of the class, the class attorney must not allow decisions on behalf of the class to rest exclusively with the named plaintiffs."); *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 179, 187 (2d Cir.1987) ("A plaintiff who joins in a class action ... gives up his or her right to control the litigation in

action would also depend, to some extent, on whether their counsel agreed (and ultimately, on the court's approval).

■ Most relevantly for present purposes, the named plaintiffs were operating in a context in which it was possible that their counsel might take a different view of the advisability of settlement, and act on that view in the face of their objections. This is so because counsel owed a duty to act in good faith on behalf of all intended beneficiaries of the representative action, and not simply at the direction of the named plaintiffs.[36]

Because representative litigation must be conducted on behalf of a large group of beneficiaries who almost by definition cannot all appear personally before the court, the disqualification rules governing purely individual actions do not make sensible public policy when imported into the representative context.[37] The primacy those rules rightly place on the decision-making authority of named plaintiffs in the individual context is ill-suited for representative

return for the economies of scale available under" the class action rules.).

**36.** As the new Restatement of the Law Governing Lawyers puts it,

> A class-action lawyer may ... be privileged or obliged to oppose the views of the class representatives after having consulted with them. The lawyer may also propose that opposing positions within the class be separately represented, that sub-classes be created, or that other measures be taken to ensure broader class participation. Withdrawal may be an option ... but one that is often undesirable because it may leave the class without effective representation. The lawyer should act for the benefit of the class as its members would reasonably define that benefit.

RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 14, cmt. f(1998). The commentary in *Developments in the Law: Conflicts of Interest in the Legal Profession* is similarly instructive on this subject:

> [T]he lawyer client relationship includes at least three duties: obedience, confidence, and loyalty. The duty of obedience is to follow the client's orders. *The filing of a class action severs the duty of obedience to the individual named plaintiff,* and no one else is in a position to assert that duty. But duties of confidence and loyalty remain ... The duty of loyalty calls for the lawyer to act in the best interests of his client. In traditional attorney-client relationships, this duty can conflict with the duty of obedience when the lawyer must tell the client not to do something the client wants to do. The duty of loyalty is particularly relevant to class counsel because a class action prototypically represents interests. *If the inter-*

> *ests of all class members are the same,* there is no conflict of interest even if the class members disagree, because the disagreement concerns the new severed duty of obedience. It is only when interests, not volitions, of class members disagree that class counsel faces a conflicts problem.

94 HARV. L.REV. 1244, 1453–54 (1981) (emphasis added).

**37.** As Judge Posner wrote in *Bash v. Firstmark Standard Life Ins. Co.:*

> [C]onflicts of interests are built into the device of a class action, where a single lawyer may be representing a class consisting of thousands of persons not all of whom will have identical interests and views. Recognizing that strict application of rules on attorney conduct that were designed with simpler litigation in mind might make the class-action device unworkable in many cases, the courts insist that a serious conflict be shown before they will take remedial or disciplinary action.

861 F.2d 159, 161 (7th Cir.1988); *see also Pettway,* 576 F.2d at 1176 (describing generally the inappropriateness of importing traditional ethics rules from individual-plaintiff cases into the class action context); *In re "Agent Orange,"* 818 F.2d at 179 (when an action has continued for many years, the prospect of having those most familiar with it be automatically disqualified whenever class members have conflicting interests "would substantially diminish the efficacy of class actions as a method of dispute resolution"; thus, traditional rules of representation outside class context "should not be mechanically applied to the problems that arise in the settlement of class action litigation").

actions, because those rules would permit named plaintiffs to hold the other beneficiaries of representative actions hostage to their whims by forcing counsel to bend to the will of the named plaintiffs or be disqualified.[38]

■ To avoid a counter-productive structure of this kind, prior precedent makes clear that counsel in a derivative and/or class action may present a proposed settlement over the objections of the named plaintiffs. The mere fact that the counsel takes a different view on the advisability of a settlement than the named clients does not, in itself, constitute grounds for disqualification. As Judge Friendly stated in the derivative case of *Saylor v. Lindsley,*

> [D]espite the seeming incongruity, ... the assent of the plaintiff (or plaintiffs) who brought a derivative stockholder's action is not essential to a settlement; a contrary view would put too much power in a wishful thinker or a spite monger to thwart a result that is in the best interests of the corporation and its stockholders.[39]

In adopting the same rule for class actions, the United States Court of Appeals, speaking through Chief Judge Becker, noted in *Lazy Oil Co. v. Witco Corp.:*

In many class actions, one or more class representatives will object to a settlement and become adverse parties to the remaining class representatives (and the rest of the class). If, by applying the usual rules on attorney-client relations, class counsel could be easily disqualified in these cases, not only would the objectors enjoy great 'leverage,' but many fair and reasonable settlements would be undermined by the need to find substitute counsel after months or even years of fruitful settlement negotiations.[40]

■ For that reason, the *Lazy Oil* opinion held that in the class action context, once certain class representatives object to a settlement negotiated on their behalf, "class counsel may continue to represent the remaining class representatives and the class, as long as the interest of the class in continued representation by experienced counsel is not outweighed by the actual prejudice to the objectors of being opposed by their former counsel."[41] In adopting this more flexible approach, the federal courts have been cognizant of the high level of judicial involvement in representative actions. This involvement provides protection to all of the plaintiffs, and diminishes the need for a rigid application of disqualification rules designed for individual actions.[42]

---

**38.** The awkwardness of applying the ethical rules for individual actions in representative litigation was perhaps best illustrated in Judge Adams's concurring opinion in *In re Corn Derivatives Antitrust Litig.,* 748 F.2d 157, 162 (3d Cir.1984). In that opinion, he noted that under the traditional rules, class counsel would arguably have to withdraw whenever any member of the class objected to a settlement because whatever she did, she would be taking a position adverse to one of her clients. *Id.* at 162–63.

**39.** 456 F.2d 896, 899–900 (2d Cir.1972).

**40.** 166 F.3d 581, 589 (3d Cir.1999).

**41.** *Id.* at 590.

**42.** For instance, see the comments of Judge Adams in his concurrence in the *Corn Derivatives* case:

> [T]he duty owed in a class action is in some ways unique and cannot be equated with that in the traditional lawyer-client setting. The inherent risks in a class action are 'accepted structural' facts, known to those who choose to participate in a class. Moreover, the legal system has responded to the risk with an array of carefully calibrated safeguards. Courts have affirmed the special responsibility placed upon the trial judge to protect the rights of class members. In addition, the Federal Rules of Civil Procedure impose strict procedural requirements on the conduct of class actions. *See* Fed.R.Civ.P. 23. Of special significance

The balancing approach adopted by the U.S. Court of Appeals for the Third Circuit in *Lazy Oil* is a sensible way to deal with the uncomfortable situation that exists when counsel seek to present a settlement over the objection of the named plaintiffs.[43] It recognizes that the named plaintiffs have legitimate interests that might dictate disqualification in particular circumstances, while acknowledging the right to effective counsel of the larger class whose rights are implicated by the representative litigation. This method of addressing these issues is also in keeping with the most recent Restatement of the Law Governing Lawyers.[44]

■ Applying that approach here, I conclude that the interests of MFW stockholders unaffiliated with the defendants weigh heavily in favor of permitting the Participating Firms to present the Proposed Settlement. The Participating Firms conducted thorough discovery in pursuit of a rescission and damages remedy on behalf of MFW and/or the proposed class. They prosecuted a full week of trial. They are therefore in the position to give the court a reasoned and factually well-supported recitation of the reasons that they believe a settlement is in the best interests of MFW and the proposed class. By contrast, disqualifying the Participating Firms would deprive the Participating Plaintiffs, MFW, and the proposed class – as well as the court – of the views of the lawyers who have done all the work on their behalf to date. That result is not in the interests of justice.

This is especially so given the lack of prejudice to the Objectors. The record is clear that the Participating Firms gave the Objectors information about the Proposed Settlement in a timely enough fashion to permit them to inform the court rapidly of their dissent. In addition, the Participating Firms helped the Objectors find other counsel to present the objections and encouraged the court to set a schedule that would permit them to file well-articulated objections. In this respect, the record in this case is so well-developed that the Objectors' new counsel were in the advantageous position of having a rich body of evidence from which to make the case that the plaintiffs' claims were too strong to be

is the trial court's role in the supervision and approval of class settlements, based on the criterion of fairness. The attorney's duty to the class requires him or her to make known to the court any conflicts in order that the court may take appropriate steps to protect the interests of all class members.

748 F.2d at 164–65 (Adams, J. concurring) (internal case citations omitted).

On at least one prior occasion, this court has approved a settlement advocated by counsel over the objections of the named plaintiff. *See* Settlement Tr. in *Harman v. Masoneilan, Inc.* before Jacobs, V.C., 11/25/86 at 41, 51–52, Aff. of N. Monhait Ex. G.

**43.** Other federal courts which have addressed these situations have adopted a similar balancing approach. *See, e.g., In re Agent Orange,* 818 F.2d 179.

**44.** [D]ifferences within the class do not necessarily produce conflicts requiring that the lawyer for the class not represent some or all members of the class or necessitate creation of subclasses. The tasks of a lawyer for a class may include monitoring and mediating such differences. *In instances of intractable difference, the lawyer may proceed in what the lawyer reasonably concludes to be the best interests of the class as a whole, for example urging the tribunal to accept an appropriate settlement even if it is not accepted by class representatives or members of the class.* In such instances, of course, the lawyer must inform the tribunal of the differing views within the class or on the part of a class representative.

RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 128, cmt. d(iii) (emphasis added).

compromised for the consideration offered by the Proposed Settlement.

In this same vein, I also reject the Objectors' argument that the Participating Firms should be disqualified because they allegedly did not consult adequately with the Objectors before deciding to support the Proposed Settlement. As mentioned previously, the weight of the record evidence heavily contradicts the Objectors' position on this question. Nonetheless, I concede there might be a disputed fact about the adequacy of those consultative efforts.

 But, even if it were the case that the Participating Firms' conduct was deficient in that regard, that fact alone would not support disqualification. The Participating Firms clearly gave the Objectors timely enough information about the Proposed Settlement to permit them to make an informed decision whether to support the Settlement, and to locate and have alternative counsel present an objection on their behalf. Therefore, the Participating Firms fulfilled the key task of ensuring that the court could evaluate all the views of the beneficiaries of this representative action, and not just those of the proponents of the settlement. Since the litigation itself can therefore proceed with no prejudice to the Objectors, it is not sensible to hold a mini-trial to determine whether the Participating Firms committed some breach of their professional duties that does not compromise the integrity of this proceeding. If the Objectors wish, they can seek to hold the Participating Firms accountable for any such breach by filing a disciplinary complaint.

**45.** An additional reason exists to deny the motion as to the following Participating Firms: Garwin Bronzaft; Brualdi; and Wechsler Harwood. None of these firms ever had a direct relationship with one of the Ob-

For the foregoing reasons, the Objectors' Motion to Disqualify is hereby DENIED. IT IS SO ORDERED.

jectors. Their only relationship to any Objector was that the Objectors were MFW stockholders, and as participants on the plaintiffs' "Committee of the Whole" in this consolidated action.