# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| IN RE ORBIT/FR, INC.<br>STOCKHOLDERS LITIGATION | )  C.A. No. 2018-0340-JTL<br>) |

## MEMORANDUM OPINION REGARDING INCENTIVE AWARD

Date Submitted: February 4, 2026
Date Decided: April 13, 2026

A. Thompson Bayliss, E. Wade Houston, Caitlin C. Bozman, Ben Lucy, Clara Hubbard, ABRAMS & BAYLISS LLP, Wilmington, Delaware; *Attorneys for Lead Plaintiff AB Value Partners, L.P.*

Bradley R. Aronstam, S. Michael Sirkin, Marguerite A. O'Brien, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; John A. Neuwirth, Evert J. Christensen, Jr., Honghu Wang, WEIL, GOTSHAL & MANGES LLP, New York, New York; *Attorneys for Defendants Microwave Vision S.A., Philippe Garreau, and Arnaud Gandois.*

Henry E. Gallagher Jr., Shaun Michael Kelly, Sara A. Barry, Louis F. Masi, CONOLLY GALLAGHER LLP, Wilmington, Delaware; *Attorneys for Defendant Per Iversen.*

**LASTER, V.C.**

A lead plaintiff made an exceptional contribution to a class action that generated a successful settlement. The named plaintiff seeks an incentive award for its contributions. This decision grants the request.

## I.    FACTUAL BACKGROUND

The facts are drawn from the plaintiff's brief in support of the settlement and the documents incorporated by reference.

### A.    The Company

Orbit/Fr, Inc. (the "Company") was a Delaware corporation specializing in the production of antenna measurement systems. Microwave Vision Group S.A. ("Parent") owned 61.6% of its common stock. The Company's board of directors (the "Board") consisted of three Parent nominees and two independent directors.

Parent entered into a global services agreement with its affiliates, including the Company (the "Services Agreement"). Under the Services Agreement, Parent charged its expenses to its affiliates. Parent also pooled all of its affiliates' expenses, allocated the burden among them, and required each affiliate, including the Company, to pay its allocated share. The Company bore a disproportionate share of the total expenses, and Parent made the impact worse by adding a markup to the salaries for its personnel and for personnel at affiliates other than the Company. Parent also charged its subsidiaries a management fee that was based on each subsidiary's profitability rather than on the value of Parent's services. Parent similarly charged its subsidiaries trademark fees based on their profitability rather than the value of the intellectual property.

**B.     AB Value Invests In The Company.**

In 2011, AB Value Partners, L.P. invested in the Company. AB Value is an investment fund.

In 2013, Parent offered to buy out AB Value for $1 per share. AB Value rejected the offer and counteroffered to buy Parent's stock in the Company at the same price. Parent said no.

Parent again expressed interest in buying AB Value's shares in 2015. Those discussions went nowhere.

**C.     The Squeeze-Out Merger**

In 2016, Parent proposed a squeeze-out merger that would convert the shares held by the Company's minority stockholders into the right to receive $2.82 per share, conditioned on approval by a special committee. The Board formed a special committee (the "Committee"). A year later, Parent restructured the deal to remove the requirement of special committee approval and replace it with a majority-of-the-minority vote. After determining that AB Value could block the majority-of-the-minority vote, Parent waived that condition.

The Committee's financial advisor indicated that it could not give a fairness opinion at the price offered. After learning about the waiver of the majority-of-the-minority vote, the financial advisor resigned.

Meanwhile, Parent explored selling itself to third parties. As part of the sale process, Parent retained outside counsel to investigate its transfer pricing. Counsel opined that the transfer pricing methods violated applicable tax regulations. Parent declined to change its policies.

2

In January 2018, the Committee hired Stout Risius Ross, LLC ("Stout") as its replacement financial advisor. Stout valued the Company at between zero and $0.51 per share, well below the proposed merger consideration.

In February 2018, the Committee and Parent met for less than half an hour. During that brief meeting, they agreed on a price of $3.30 per share.

Just two days later, a third party buyer (the "Potential Buyer") expressed interest in acquiring Parent for between $149.6 to 162.1 million. That valuation reflected a premium of 85% to 100% over Parent's market capitalization of $81 million. A significant portion of Parent's value was attributable to the Company.

In March 2018, Stout opined that the merger consideration was fair. Stout's underlying materials valued the Company between zero and $0.22 per share, less than half of its original analysis. Stout's valuation omitted key information about the Company's growth. In reliance on Stout's opinion, the Committee recommended the merger. In reliance on the Committee's recommendation, the Board approved the merger. Parent delivered the stockholder vote.

In April 2018, the merger closed. Later that month, the Potential Buyer withdrew its expression of interest based on concerns about Parent's transfer pricing.

**D.  Minerva Sues.**

In May 2018, a stockholder named Minerva Group, LP sued Parent and a subset of the Company's directors. Levi & Korsinky, LLP ("Original Counsel") represented Minerva.

Original Counsel alleged that the defendants breached their fiduciary duties by engaging in the merger. The defendants moved to dismiss the complaint, but the

3

court denied the motion. The parties began settlement discussions. In early 2020, Original Counsel agreed to settle the dispute for $825,000, subject to confirmatory discovery (the "Original Settlement").

Meanwhile, Parent launched a public sale process. In July 2020, a private equity firm agreed to acquire a 52.9% stake in Parent for $208.9 million (the "PE Investment"). Parent's financial statements showed that the Company was responsible for 63% of Parent's revenue and over 90% of Parent's EBITDA. On a pro rata basis, the purchase implicitly valued the Company at $132 to $188 million. The merger, by contrast, valued the Company at just $20 million.

## E. AB Value Objects To Original Counsel's Settlement.

In June 2021, Original Counsel presented the Original Settlement for approval. AB Value retained Abrams & Bayliss LLP ("New Counsel"), objected to the settlement, and moved to take over the case as lead plaintiff. Minerva and Original Counsel defended the Original Settlement.

After extensive proceedings, the court rejected the Original Settlement and allowed AB Value to take over the case, conditioned on AB Value providing security to protect the other minority stockholders' share of the $825,000 Original Settlement. AB Value posted $395,000 as security. Seeking to move quickly, AB Value placed the funds in a non-interest-bearing account under its counsel's control.

Parent had not opposed AB Value's efforts. Now, however, Parent resisted replacing Original Counsel with New Counsel. The court ultimately authorized New Counsel to take over.

4

**F.    AB Value and New Counsel Pursue The Case.**

In May 2022, AB Value and New Counsel filed a Verified Substitute Class Action Complaint. That pleading reflected two new theories. First, the complaint attacked the fees that Parent charged the Company under the Services Agreement and contested the resulting liabilities. Second, the complaint argued that the PE Investment provided a credible arm's-length indication of the value of the Company.

In June 2022, AB Value and New Counsel began conducting discovery. They served requests for documents, interrogatories, and subpoenas that went far beyond what Original Counsel had pursued.

The defendants resisted discovery. In July 2022, the Company filed a renewed motion to dismiss and sought to stay discovery pending its resolution. The court denied the motion for a stay and later denied the motion to dismiss, although the court dismissed one director from the case.

Parent objected to producing any discovery predating April 6, 2018, a period critical to AB Value and New Counsel's theories. In August 2023, AB Value and New Counsel moved to compel discovery. In October, the court granted the motion.

During this period, the parties conducted a mediation. AB Value paid to retain experts who prepared reports in support of the mediation. The mediation proved unsuccessful.

AB Value and New Counsel next sought additional discovery from third parties, including from the Committee's original financial advisor, Parent's auditor, and Stout. AB Value and New Counsel filed a second motion to compel to obtain discovery the defendants withheld, including (1) documents Parent claimed were

privileged, (2) communications between Parent and other subsidiaries that paid fees under the Services Agreement, and (3) the Company's customer contracts. In December 2024, the court granted the second motion to compel.

In March 2024, AB Value and New Counsel hired two experts. One expert opined on the Company's valuation and the scientific and regulatory areas pertinent to the Company's business. The other expert opined on transfer pricing issues and addressed whether the Services Agreement complied with applicable regulations.

At that point, AB Value and New Counsel decided they also needed an expert to address the Company's customer contracts. AB Value's Chief Operating Officer, David Polonitza, identified an expert on that topic.

In the weeks before trial, AB Value and New Counsel moved to exclude Parent's expert because he received transfer pricing data that Parent had refused to produce. The court ordered the defendants to issue a corrected report omitting the withheld information and prohibited Parent from submitting a new expert analysis.

After those changes, Parent's expert valued the Company at $4.11 per share. That value was materially higher than the merger consideration. It is rare for a defense-side expert to opine that the merger consideration was too low.

## G.    The Settlement

With trial looming, the parties resumed mediation. This time, the discussions were successful. Two days before trial, the parties settled for $17,850,000, or $7.75 per share. The settlement consideration reflected a 235% premium over deal price. It was 21.64 times the Original Settlement.

6

## II.    LEGAL ANALYSIS

AB Value seeks an incentive award as restitution for the considerable time and effort it devoted to this action. "The Delaware Supreme Court has recognized that a class representative can receive an incentive fee based on (i) the time, effort, and expertise expended by the class representative, and (ii) the benefit to the class."[1] "A restitution-based award necessarily includes out-of-pocket costs, but it must go beyond that to fulfill its mission. A representative plaintiff must devote time to the litigation, and if that time has to be offered *gratis*, then the representative plaintiff effectively pays for taking on the role of class representative."[2] Without an incentive award to make the named plaintiff whole, the plaintiff receives less than the other class members.[3]

Serving as the representative plaintiff comes with other challenges that go beyond devoting time to the litigation. "In the current litigation environment, a stockholder who files plenary litigation faces 'the very real possibility of having their computer and other electronic devices imaged and searched, sitting for a deposition—

---

[1] *In re Dell Techs. Inc. v. Class V. S'holders Litig.*, 300 A.3d 679, 733 (Del. Ch. 2023) (citing *Raider v. Sunderland,* 2006 WL 75310, at *1 (Del. Ch. Jan. 4, 2006)).

[2] *Id.*

[3] *Id.*

7

perhaps more than one if they institute [Section] 220 litigation—and then perhaps testify at trial.'"[4]

A named plaintiff also faces the risk of reputational harm, as *Chen v. Howard* illustrates.[5] Chen was a securities analyst and professional investor who contributed significantly to a $35 million settlement for the class. As one of the named plaintiffs, Chen produced documents and was deposed. The defendants used the discovery to accuse Chen of trading on confidential information and sought sanctions against him. Although both the court and the SEC cleared Chen of any charges, he incurred substantial expenses defending himself. The allegations ensnared another investor and the original named plaintiff, whom Chen regarded as his mentor, and destroyed their relationship.[6] Chen attested that media articles associated with the allegations had prevented him from finding another job on Wall Street.[7]

Public policy supports awarding incentive awards to deserving named plaintiffs. "'Compensating the lead plaintiff for efforts expended is not only a rescissory measure returning certain lead plaintiffs to their position before the case

---

[4] *Id.* (quoting *Verma v. Costolo*, C.A. No. 2018-0509-PAF, at 52–53 (Del. Ch. July 27, 2021) (TRANSCRIPT)).

[5] *Chen v. Howard-Anderson*, 2017 WL 2842185, at *6 (Del. Ch. June 30, 2017).

[6] *See Steinhardt v. Howard-Anderson*, 2012 WL 29340 (Del. Ch. Jan. 6, 2012).

[7] *See* Charles R. Korsmo & Minor Myers, *Lead Plaintiff Incentives in Aggregate Litigation*, 72 Vand. L. Rev. 1923, 1940 (2019).

was initiated, but an incentive to proceed with costly litigation (especially costly for an actively participating plaintiff) with uncertain outcomes.'"[8]

Despite what some academics have claimed, Delaware judges do not favor plaintiffs over defendants, and the practice of approving incentive awards does not reflect some pro-plaintiff bias. "Scholars have provided sound reasons for the Delaware courts to move beyond purely restitution-oriented awards and for expanding, rather than restricting, the payment for incentive fees, albeit with criteria to minimize agency costs and avoid windfalls."[9] Federal courts commonly award incentive fees, and scholars strongly support the awards, when they compensate experienced investors for providing effective oversight and benefits to the class.[10]

In this case, the court approves an award of $730,000.

## A. Time, Effort, And Resources Expended

One factor to consider is whether a named plaintiff has expended substantial time, effort, and resources in achieving this successful outcome. "An award may be justified where the plaintiff has devoted a significant amount of time and effort to litigating the case."[11] An award also may be warranted "where the named plaintiff

---

[8] *Dell Class V*, 300 A.3d at 733 (quoting *Raider*, 2006 WL 75310, at *1).

[9] *Id.* (citing Korsmo & Myers, *supra*, at 1320).

[10] *Id.*; *see, e.g.*, Theodore Eisenberg & Geoffrey P. Miller*, Incentive Awards to Class Action Plaintiffs: An Empirical Study*, 53 UCLA L. Rev. 1303, 1320, 1348 (2006); William B. Rubenstein et al*., Newberg and Rubenstein on Class Actions* § 17:3, (6th ed. 2022), Westlaw (database updated Dec. 2025).

[11] *Chen*, 2017 WL 2842185, at *4.

has provided meaningful expertise during the course of litigating the case."[12] AB Value satisfied this factor.

AB Value's contribution to the case started long before it took over as named plaintiff. During the merger negotiations, AB Value repeatedly refused to sell its shares to Parent, effectively protecting smaller investors. Although AB Value's pre-litigation resistance does not enter into the incentive award calculation, it is notable nonetheless.

After Minerva sued and Original Counsel filed suit, AB Value monitored the litigation. When Original Counsel presented the Original Settlement, AB Value evaluated whether it provided sufficient consideration. That effort required the investment of significant resources. AB Value hired New Counsel, and together they developed new theories of liability and damages. They successfully advanced those theories to defeat the settlement, a comparatively rare event in Delaware jurisprudence. Not only that, but when the court conditioned its disapproval on AB Value posting security to protect the value of the settlement for the other class members, AB Value placed $395,000 in escrow. By taking that step, AB Value lost its ability to access that money for the rest of the litigation. More important, AB Value ensured that for the other class members, continuing the litigation was an only-upside, no-downside proposition. Not so for AB Value. After posting security, AB Value bore all of the downside risk.

---

[12] *Id.*; *see Ginsburg v. Phila Stock Exch., Inc.*, 2008 WL 2901814, at *1–2 (Del. Ch. July 2, 2008) (ORDER).

AB Value also invested its resources in hiring New Counsel. Despite an extensive search, AB Value could not identify a high-quality law firm that would take the case on a wholly contingency basis. That is a problem endemic to litigation involving small cap companies.[13] Here, AB Value addressed the problem by agreeing to front New Counsel's fees at its hourly rates. If AB Value and New Counsel had not prevailed, AB Value would have eaten those expenses.

After taking over the case, AB Value played a significant role. Polonitza was deeply involved in the litigation. He exchanged over 17,000 emails with counsel, spent many hours in meetings and on calls, attended every fact and expert deposition but one, and reviewed tens of thousands of English and French documents. He estimates that he devoted over 2,400 hours to the case.

Polonitza also contributed significantly to the outcome. He used his financial expertise to help develop and test valuation theories. He also assisted with discovery strategy and helped draft requests and responses. When AB Value and New Counsel decided they needed an expert to address the Company's customer contracts, Polonitza tracked one down. That expert was a hidden gem: He produced two high-quality expert reports and gave a deposition for less than $85,000.

---

[13] *See Baker v. Sadiq*, 2016 WL 4375250, at *6 (Del. Ch. Aug. 16, 2016); *see generally In re Harvest Cap. Credit Corp. S'holder Litig.*, C.A. No. 2021-0164, at 31–32 (Del. Ch. July 2, 2024) (TRANSCRIPT).

Together, AB Value and New Counsel engaged in significant litigation efforts. They defeated a motion to dismiss, won three discovery motions, argued nine hearings, and partially excluded an expert report.

## B.    The Benefit Obtained For The Class

Another factor to consider is whether "the named plaintiff has generated significant benefits for the class."[14] AB Value contributed meaningfully to a litigation effort that obtained a 235% premium over the deal price.

That is a significant benefit. In *Dell Class V*, the parties identified seven settlements in deal cases since *Americas Mining*[15] where (1) the deal value was less than $100 million and (2) entire fairness presumptively applied. The following table reflects those data points:

|  | Year | Transaction Value | Settlement Value | % of Deal Value |
|---|---|---|---|---|
| Weinstein | 2020 | 5.12 | 1.4 | 27 |
| Orchard | 2014 | 10.725 | 6.5 | 195 |
| Schuff | 2020 | 22.7 | 25.92 | 114.13 |
| Good | 2018 | 37 | 57 | 140 |
| Salladay | 2023 | 44.3 | 9 | 20.32 |
| C&D Tech | 2016 | 52.1 | 1 | 1.95 |
| Cornerstone | 2017 | 70.8 | 17.9 | 25.3 |

The 235% recovery in this case is more than double the nearest precedent.

The settlement that AB Value and New Counsel achieved also dwarfs the Original Settlement that Original Counsel produced. Original Counsel settled for

---

[14] *Chen*, 2017 WL 2842185, at *4.

[15] *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213 (Del. 2012).

$825,000. AB Value and New Counsel secured $17,850,000, an amount 21.64 times bigger.

## C.     Comparison To Past Awards

As with fee awards to counsel, a court can look to prior incentive awards for guidance. "Precedent awards from similar cases may be considered for the obvious reason that like cases should be treated alike."[16]

A representative plaintiff often has limited involvement in a suit. A plaintiff may only review the pleadings, engage with counsel, and agree to any settlement. Efforts of that level "do not automatically entitle the plaintiff to a bonus; the starting presumption is the opposite."[17] A representative plaintiff who does more may be entitled to an award. The leading precedents involving more significant investments of resources are *Santander*,[18] *Chen*,[19] *Virtus*,[20] and *El Paso*.[21]

---

[16] *Olson v. EV3, Inc.*, 2011 WL 704409, at *8 (Del. Ch. Feb. 21, 2011).

[17] *In re Santander Consumer USA Hldgs. Inc. S'holders Litig.*, 2025 WL 1012345, at *5 (Del. Ch. Mar. 31, 2025); *see Oliver v. Bos. Univ.*, 2009 WL 1515607, at *1 (Del. Ch. May 29, 2009) ("Awards to representative plaintiffs should be rare.").

[18] *In re Santander*, 2025 WL 1012345, at *4, *7 (holding that lead plaintiff was entitled to an incentive award of $500,000 after contributing 1,630 hours to the litigation).

[19] *Chen*, 2017 WL 2842185, at *4, *6 (awarding $1 million to lead plaintiff that devoted 4,000 hours to litigation).

[20] *Virtus Cap. L.P. v. Sterling Chems., Inc.*, C.A. No. 6951-VCL, at 20, 54–56 (Del. Ch. Jan. 5, 2017) (TRANSCRIPT) (awarding $350,000 to lead plaintiff that devoted 1,340 hours to litigation).

[21] *In re El Paso Pipeline P'rs, L.P.*, 2016 WL 451320, at *2 (Del. Ch. Feb. 4, 2016) (ORDER) (awarding $450,000 to lead plaintiff that devoted 1,500 hours to

Despite its many flaws, an implied hourly rate provides a simple method of cross-case comparison. The results are $307 per hour in *Santander*, $250 per hour in *Chen*, $261 per hour in *Virtus*, and $300 per hour in *El Paso*. Those figures have not been adjusted for inflation.

An award of $730,000 implies a rate of $302 per hour, on par with *El Paso* and *Santander*. The symmetry with *Santander* is reassuring, because that is the most recent of the precedents.

## D. The Risk Of Conflicts And Perverse Incentives

Finally, a court must also guard against the conflicts of interest and perverse incentives that an incentive award could create.[22] There is no chance that the

---

litigation), *vacated on other grounds sub nom. El Paso Pipeline GP Co. v. Brinckerhoff*, 152 A.3d 1248 (Del. 2016).

[22] *In re Santander*, 2025 WL 1012345, at *2 ("It could, for example, tempt a class representative to accept a result unfavorable to the class if an incentive payment is offered. Or, a plaintiff might withhold consent to 'an optimal settlement in the hopes of achieving a larger settlement' with a larger incentive fee." (quoting *Raider*, 2006 WL 75310, at *1)). Severing the merits negotiation from any discussion of attorneys' fees or an incentive award helps address the first risk. The ability of plaintiff's counsel to settle without lead plaintiff support helps address the second. *See generally In re M & F Worldwide Corp. S'holders Litig.*, 799 A.2d 1164, 1177 (Del. Ch. 2002). Traditionally, the problem with private enforcement has not been excessive risk taking, but rational risk aversion leading to the mass filing of weak cases and early harvesting without triaging the merits. *See generally Sciabacucchi v. Salzberg*, 2018 WL 6719718, at *8 (Del. Ch. Dec. 19, 2018), *rev'd on other grounds*, 227 A.3d 102 (Del. 2020); *In re Trulia, Inc. S'holder Litig.*, 129 A.3d 884, 891–99 (Del. Ch. 2016); Jill E. Fisch, Sean J. Griffith & Steven Davidoff Solomon, *Confronting the Peppercorn Settlement in Merger Litigation: An Empirical Analysis and a Proposal for Reform*, 93 Tex. L. Rev. 557, 557–72 (2015); Browning Jeffries, *The Plaintiffs' Lawyer's Transaction Tax: The New Cost of Doing Business in Public Company Deals*, 11 Berkeley Bus. L.J. 55, 66–91 (2014); Sean J. Griffith & Alexandra D. Lahav, *The Market for Preclusion in Merger Litigation*, 66 Vand. L. Rev. 1053, 1060–73 (2013). Incentive awards help offset those tendencies, as does the stage-of-the case method

14

prospect of an incentive award created any problematic incentives or undermined the outcome in this case.

## III. CONCLUSION

AB Value's request for an incentive award is granted in the amount of $730,000.

---

for setting fees. *See In re Emerson Radio S'holder Derivative Litig.*, 2011 WL 1135006, at *4 (Del. Ch. Mar. 28, 2011) (explaining benefits of stage-of-the-case method); *see also* John C. Coffee, Jr., *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions*, 86 Colum. L. Rev. 669, 690 (1986) ("[P]laintiff's attorneys have an incentive to settle prematurely and cheaply when they are compensated on the traditional percentage of the recovery basis."); Alon Harel & Alex Stein, *Auctioning for Loyalty: Selection and Monitoring of Class Counsel*, 22 Yale L. & Pol'y Rev. 69, 71 (2004) ("The class attorney's egoistic incentive is to maximize his or her fees—awarded by the court if the action succeeds—with a minimized time-and-effort investment. This objective does not align with a both zealous and time-consuming prosecution of the class action, aimed at maximizing the amount of recovery for the class members.").

15