**EFiled: Dec 29 2023 10:38AM EST**
**Transaction ID 71711228**
**Case No. 2023-0418-JTL**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| IN RE FOX CORPORATION DERIVATIVE LITIGATION | CONSOLIDATED<br>C.A. No. 2023-0418-JTL |

## OPINION ESTABLISHING LEADERSHIP STRUCTURE

Date Submitted: November 9, 2023
Date Decided: December 29, 2023

Joel Friedlander, Jeffrey M. Gorris, Christopher M. Foulds, FRIEDLANDER & GORRIS, P.A., Wilmington, Delaware; Julie Goldsmith Reiser, Molly J. Bowen, Brendan Schneiderman, COHEN MILSTEIN SELLERS & TOLL PLLC, Washington, DC; Katherine Lubin Benson, LIEFF CABRASER HEIMANN & BERNSTEIN, LLP, San Francisco, California; Nicholas Diamond, Gabriel A. Panek, LIEFF CABRASER HEIMANN & BERNSTEIN, LLP, New York, New York; Ellen Rosenblum, Attorney General, and Brian A. de Haan, Senior Assistant Attorney General, OREGON DEPARTMENT OF JUSTICE, Portland, Oregon; *Attorneys for Plaintiffs New York City Employees' Retirement System, New York City Board of Education Retirement System, New York City Fire Department Pension Fund, New York City Police Pension Fund, and New York City Teachers' Retirement System.*

Andrew E. Blumberg, Daniel E. Meyer, BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP, Wilmington, Delaware; Ned Weinberger, LABATON SUCHAROW LLP, Wilmington, Delaware; Christopher H. Lyons, Tayler D. Bolton, ROBBINS GELLER RUDMAN & DOWD LLP, Wilmington, Delaware; Randall J. Baron, David A. Knotts, ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California; Lee Rudy, Eric L. Zagar, Geoffrey C. Jarvis, KESSLER TOPAZ MELTZER & CHECK, LLP, Radnor, Pennsylvania; Jeremy Friedman, David Tejtel, FRIEDMAN OSTER & TEJTEL PLLC, Bedford Hills, New York; *Attorneys for Plaintiffs Sjunde AP-Fonden and Public Service Pensions Board of the Cayman Islands.*

**LASTER, V.C.**

In the wake of the 2020 presidential election, the Fox News network broadcast statements accusing two voting machine companies of facilitating election fraud. The voting machine companies sued for defamation. Fox Corporation (the "Company") paid $787.5 million to settle one lawsuit. Another remains pending.

Various stockholders filed derivative complaints that seek to shift the losses the Company suffered from the entity to the directors and officers who the stockholders say caused the harm. Those actions have been consolidated.

Two competing teams seek leadership roles. Each lead counsel team is well-qualified and could litigate the case. Each lead plaintiff team has strengths and weaknesses.

This is the first decision interpreting recently amended Rule 23.1, which now identifies factors for a court to consider when resolving a leadership dispute. After balancing those factors, this decision selects the Friedlander Team as lead counsel and the NYC/Oregon Funds as lead plaintiffs.

## I.      FACTUAL BACKGROUND

The facts are drawn from the currently operative pleadings and the documents they incorporate by reference. For purposes of this ruling, the court assumes the allegations to be true.

### A.      The Election Coverage

On November 3, 2020, Fox News was the first media outlet to call Arizona—a key battleground state—for Joe Biden. Loyal viewers immediately began criticizing the network and shifting to other news outlets.

Leading up to election night, former President Donald Trump stated publicly and repeatedly that he only could lose if the election were rigged. Trump continued making those claims after election day. Rupert Murdoch and other Company directors privately viewed Trump's claims as baseless.

After the backlash from the Arizona call, Fox News changed course. Beginning on November 5, 2020, its outlets began flooding the airwaves with claims that the election had been stolen.

A common allegation called out voting machines manufactured by Dominion Voting Systems and Smartmatic USA. Fox News hosts and guests claimed that the machines were rigged. Behind the scenes, nearly everyone in the chain of command, including the show hosts, agreed that the claims were baseless.

On November 12, 2020, Dominion sent Fox News the first of what eventually would add up to thousands of letters and emails protesting the statements about its voting machines. Dominion repeatedly provided evidence that the statements were false and asked Fox News to stop its defamatory coverage. Fox News continued to air election fraud claims, including allegations about Dominion's voting machines.

On December 10, 2020, Smartmatic sent its own letter to Fox News, identifying false and misleading statements, explaining the reasons why they were false and misleading, and demanding a full and complete retraction. Smartmatic sent a second letter on January 28, 2021. Fox News did not issue a retraction.

On February 4, 2021, Smartmatic sued the Company, Fox News, and certain key individuals for defamation in the Supreme Court of New York, New York County.

2

That suit seeks $2.7 billion in damages. It remains pending.

On March 26, 2021, Dominion sued Fox News for defamation in Delaware Superior Court. That suit sought $1.6 billion in damages. On November 8, 2021, Dominion filed a second defamation lawsuit against the Company, pointing to the Murdochs' control over the entire enterprise, including Fox News, and their personal responsibility for the false claims against Dominion.

Both Dominion lawsuits survived motions to dismiss. In December 2022, the cases were consolidated for trial. Fox News and the Company moved for summary judgment, but the court denied the motion. On the day trial was scheduled to begin, the Company agreed to pay $787.5 million to settle Dominion's claims.

## B. The Complaints

On April 11, 2023, Heyman Enerio Gattuso & Hirzel LLP and Gardy & Notis, LLP filed a derivative action on behalf of the Company against K. Rupert Murdoch, Lachlan K. Murdoch, Chase Carey, Roland A. Hernandez, and Jacques Nasser. The stockholder plaintiff was Robert Schwarz. *See Schwarz v. Murdoch, et al.*, C.A. No. 2023-0418-JTL (the "Schwarz Action").

On April 19, 2023, Labaton Sucharow LLP; Bernstein Litowitz Berger & Grossman LLP; and Friedman Oster & Tejtel PLLC entered their appearance on behalf of unidentified clients. They represented in a letter to the court that their unidentified clients were seeking books and records from the Company.

On April 20, 2023, Prickett Jones & Elliott, P.A.; the Law Office of Frank DiPrima, P.A.; Robbins LLP; Wolf Popper LLP; and Hach Rose Schirripa & Cheverie LLP filed a derivative action on behalf of the Company against K. Rupert Murdoch,

Lachlan K. Murdoch, Charles G. "Chase" Carey, Jacques Nasser, Anne Dias, Roland A. Hernandez, and Paul A. Ryan. The named plaintiffs were Julie R. Greenberg, as Trustee of The Julie R. Greenberg Revocable Trust U/A, and Carylin Riak. *See Greenberg, et al. v. Murdoch, et al.*, C.A. No. 2023-0440-JTL (the "Greenberg Action").

On June 1, 2023, Friedlander & Gorris, P.A.; Cohen Milstein Sellers & Toll PLLC; and Lieff Cabraser Heimann & Bernstein, LLP, entered their appearance on behalf of the Oregon Investment Council and the Oregon Public Employees Retirement Fund (together, the "Oregon Funds"), acting at the direction of the Oregon Attorney General and the Oregon State Treasurer. They represented in a letter to the court that their clients were seeking books and records from the Company.

On September 6, 2023, the Schwarz Action and the Greenberg Action were consolidated into this action. The consolidation order directed that any subsequent actions involving similar questions of law or fact be consolidated into this action. Most important for present purposes, the order established a schedule for stockholders and their counsel to apply to lead the consolidated action.

On September 12, 2023, Bernstein Litowitz entered its appearance on behalf of two investment funds based in Sweden: Tredje AP-Fonden and Sjunde AP-Fonden. The firm also appeared on behalf of the Public Service Pensions Board of the Cayman Islands (the "Cayman Islands Fund"); the Electrical Workers Pension Fund, Local 103, I.B.E.W.; Local 464A Welfare Service Benefit Fund; Welfare and Pension Funds of Local 464A Pension Fund; the Employees' Retirement System of Rhode Island; the Building Trades Pension Fund of Western Pennsylvania; and Dale Simpson.

4

## C.	The Leadership Applications

Leading up to the deadline for leadership applications, thirteen law firms had appeared in the case. Nine of those firms chose not to apply. Four of the original firms plus two new arrivals sought leadership roles.

The stockholder ranks saw similar turnover. Leading up to the deadline for leadership applications, fourteen stockholders had filed suit or been mentioned as potential plaintiffs. Of those, only the Oregon Funds, the Cayman Islands Fund, and one of the Swedish funds sought leadership roles. The major new entrant comprised five funds overseen by the New York City Comptroller: the New York City Employees' Retirement System, the New York City Board of Education Retirement System, the New York City Fire Department Pension Fund, the New York City Police Pension Fund, and the New York City Teachers' Retirement System (collectively, the "NYC Funds").

Only one team of lawyers remained consistent throughout the process: the Friedlander firm, Cohen Milstein, and Lieff Cabraser (collectively, the "Friedlander Team"). They appeared initially on behalf of the Oregon Funds. They applied for leadership on behalf of the New York Funds and Oregon Funds (jointly, the "NYC/Oregon Funds").

The NYC/Oregon Funds had selected the Friedlander Team through a deliberative process. The public officials who oversee the NYC/Oregon Funds—the New York City Comptroller, the Oregon Attorney General, and the Oregon State Treasurer—decided to work together to investigate issues regarding the Company. The NYC/Oregon Funds requested proposals from multiple law firms with which they

5

have relationships, and they selected the Friedlander Team. The NYC/Oregon Funds subsequently entered into a written engagement letter with the Friedlander Team that, among other things, places a negotiated cap on the fee award that the Friedlander Team can seek. The process of team formation was intentional, client-initiated, and client-driven.

The other team of lawyers (the "BLBG Team") appears to have evolved on the fly. Their leadership application calls for Bernstein Litowitz to serve as co-lead counsel with Kessler Topaz Meltzer & Check LLP and Robbins Geller Rudman & Dowd LLP. The latter two firms had not previously appeared in the case. Bernstein Litowitz initially appeared with Labaton and Friedman Oster, but the application relegates them to the role of additional counsel. It is not clear when or how Kessler Topaz or Robbins Geller joined the group, nor how the decision was made to have certain firms serve as co-lead counsel and others as additional counsel.

The BLBG Team applied for leadership on behalf of the Cayman Islands Fund and Sjunde AP-Fonden, one of the two Swedish funds that originally appeared (the "Cayman/Swedish Funds"). It is not clear how the Cayman/Swedish Funds became connected with the BLBG Team. It is not clear whether the funds or the lawyers started the discussions or whether the funds and any of the law firms had an existing relationship. The Cayman Fund and the two Swedish funds submitted a joint declaration stating that they "each individually began discussions with counsel" after the Dominion settlement and "each subsequently elected to be named plaintiffs." After submitting the declaration, one of the Swedish funds dropped out. The

6

declaration generally describes the funds' willingness to work together and with counsel, but the language is formulaic. There does not appear to be any engagement letter between the BLBG Team and the Cayman/Swedish Funds, although the BLBG Team informed the Cayman/Swedish Funds about their ability to make a fee application and the legal standards that this court would apply.

## II. LEGAL ANALYSIS

Every derivative plaintiff and its counsel must be able to "fairly and adequately represent the interests of the entity in pursuing the derivative action." Ct. Ch.. R. 23.1(c)(1) & (2). When more than one team can meet that test, "[t]he Court may resolve disputes over the appointment of derivative counsel, including who can best represent the interests of the entity in pursuing the derivative action, and may make further orders in connection with the appointment." Ct. Ch. R. 23.1(c)(3)(A).

The Court may consider the following factors when selecting derivative counsel:

(i) counsel's competence and experience;

(ii) counsel's access to the resources necessary to prosecute the litigation;

(iii) the quality of the pleading;

(iv) counsel's performance in the litigation to date;

(v) the proposed leadership structure;

(vi) the derivative plaintiff's relationship to and interest in the entity;

(vii) any conflicts between counsel or the derivative plaintiff and the entity; and

(viii) any other matter pertinent to ability of counsel or the derivative plaintiff to fairly and adequately represent the interests of the entity in the derivative action.

7

Ct. Ch. R. 23.1(c)(3)(B).

The Rule 23.1 factors are not a scorecard. *See In re Delphi Fin. Gp. S'holder Litig.*, 2012 WL 424886, at *1 (Del. Ch. Feb. 7, 2012). A proposed leadership team does not "win" appointment by being marginally better than the competition in a plurality of the factors. *Id.* The overarching question is which leadership team can "best represent the interests of the entity in pursuing the derivative action." Ct. Ch. R. 23.1(c)(3)(A). Each factor receives weight only to the extent that it bears on that ultimate question. *See Delphi*, 2012 WL 424886, at *1.

## A. Counsel's Competence And Experience

Rule 23.1(c)(3)(B)(i) calls on the court to consider counsel's competence and experience. Selecting lead counsel is a constructive hiring decision, and a court should consider the factors that a client would weigh when hiring a lawyer. Counsel's competence and experience would be at the top of the list, both generally and for the specific type of case at hand. Counsel's track record also would be critical.

Sometimes there are clear differences in the competence, experience, and track records that counsel bring to the table. *E.g.*, *In re Del Monte Foods Co. S'holders Litig.*, 2010 WL 5550677, at *9–11 (Del. Ch. Dec. 31, 2010). This is not one of those cases. All of the law firms competing for leadership are well-known to the court. All have the competence and experience to litigate the case. All have a demonstrated history of success. This factor is neutral.

## B. Access To Resources

Rule 23.1(c)(3)(B)(ii) calls on the court to consider whether counsel has access to the resources required to pursue the litigation. A client facing an expedited lawsuit

8

with many witnesses in widespread locations would be unlikely to hire a solo practitioner or a small firm. The same client might consider a small firm if the case was not expedited. Or the client might want the resources of a larger firm.

If the claims in this case survive the pleading stage, discovery is likely to be extensive, and trial will be a major undertaking. Both teams of lawyers have the resources to litigate a major case through trial against determined adversaries. This factor is also neutral.

## C.    The Quality Of The Pleading

Rule 23.1(c)(3)(B)(iii) calls on the court to consider the quality of the pleadings that the applicants have filed. Both groups have filed thorough and well-reasoned complaints. Both complaints allege claims for breach of fiduciary duty against director and officer defendants. The complaints raise many of the same factual and legal issues.

The BLBG Team prioritizes an information-systems claim that emphasizes the compliance mechanisms that the Company put in place as part of a 2013 settlement. The BLBG Team alleges that the Company abandoned those mechanisms after the Company spun off from its corporate predecessor. They allege that the Company did not reinstate any compliance measures until after the Dominion litigation began.

The Friedlander Team asserts an information-systems claim, a red-flags claim, and a *Massey* claim. The *Massey* claim asserts that Fox News operated under an illegal business model both before and after the Company spun off from its corporate predecessor. The Friedlander Team argues that Fox News is an outlier in the media industry in its disregard for truth and fact-checking protocols. They contend that the

9

journalistic practices at Fox News are part of a business model that knowingly engages in defamation and assumes the associated legal risk. To support this claim, the complaint cites multiple incidents where Fox News came under legal and ethical scrutiny for allegedly false statements both before and after the Dominion and Smartmatic litigation.

At this stage of the case, the Friedlander Team appears to have prepared a stronger complaint. That complaint incorporates factual developments and incidents at Fox News that are not included in the BLBG Team's complaint. It also includes a *Massey* claim that appears promising and is not found in the BLBG Team's complaint. As noted, both complaints were well-crafted. The Friedlander Team's complaint, however, is relatively stronger.

## D.    Counsel's Performance In The Litigation To Date

Rule 23.1(c)(3)(B)(iv) calls on the court to consider counsel's performance in the case to date. If one firm has taken noteworthy steps to advance a case, then that favors that firm's application. The court should not enable another firm to swoop in and take over the case without good reason. At the same time, this factor should not promote a tyranny of small differences. For one set of lawyers to have pushed a company to produce a few more books and records does not render their performance inherently superior. Obtaining additional books and records might be noteworthy if the materials address an important topic that another firm discounted or ignored. But being the last holdout for books and records does not automatically equal superior performance.

Nor does moving quickly when doing so is not warranted. To the contrary, in a

derivative action that seeks to recover for a corporate trauma, conducting a diligent

pre-suit investigation is far more commendable than fast filing. If dispersed

stockholders could act collectively after corporate trauma, they would not rush to

court.

> [T]hey would want the corporation to pursue claims vigorously against its fiduciaries only if there was a risk-adjusted prospect of a net-positive recovery. They would not file suit hastily, thereby imposing needlessly on themselves both the cost of their offensive litigation and the burdens of defense. The hypothetical stockholder collective would recognize there was no need to rush. The statute of limitations on a breach of fiduciary duty claim is three years. If the underlying corporate trauma resulted from a government investigation, securities class action, or some other slowly unfurling event, there would likely be further developments that would yield additional information that could materially affect whether to sue . . . .

> Rather than filing hastily, the hypothetical stockholder collective would proceed deliberately. It would hire well-qualified counsel. Through counsel, it would conduct an investigation and seek books and records using Section 220. After obtaining books and records, counsel would evaluate whether it made sense to sue. The books and records might show that the board had an appropriate monitoring system in place, but that the system did not alert the board. Or the books and records might show that despite their good faith efforts, the directors were misinformed or misled. Under these or other circumstances, the hypothetical stockholder collective logically might decide not to sue, preferring to leave their elected fiduciaries to the task of remedying the harm suffered by the corporation and dispensing with expensive litigation that likely would founder on Rule 23.1. If the stockholders had concerns, they might make a litigation demand, provide the board with the results of their investigation, and put the directors on notice. If the board declined to take action, the stockholders again could use Section 220 to investigate and consider a suit if the refusal was wrongful.

> By contrast, if the books and records showed director misconduct, then the stockholders could decide to pursue a claim. Their counsel at that point would be well positioned to plead demand futility and survive a motion to dismiss. Importantly for all concerned, the costly process of briefing and arguing motions to dismiss would take place once, based on the stockholders' post-inspection complaint.

11

*Louisiana Mun. Police Employees' Ret. Sys. v. Pyott (Pyott I)*, 46 A.3d 313, 344–46 (Del. Ch. 2012) (citations and footnotes omitted), *rev'd on other grounds*, 74 A.3d 612 (Del. 2013).

Unfortunately, two considerations complicate the efforts of entrepreneurial counsel to investigate and pursue derivative actions. One is the need to gain control of a case. Entrepreneurial counsel who receive compensation from awards of attorneys' fees only get paid if they secure a result (either at trial or through a settlement). They can't secure a result if they can't control a case. Many jurisdictions are perceived to follow a "first-filed" rule that gives control within that jurisdiction to the first firm to file a representative action. Many jurisdictions are perceived to give priority to a "first-filed" action in their jurisdiction over later-filed actions in other jurisdictions.

Those rules put pressure on plaintiffs' lawyers to file as fast as possible in an effort to gain control of the case. If a plaintiff's firm doesn't file first, then it needs to respond rapidly to compete for control or to gain a role on the prevailing team. *Id.* at 337–38. That puts firms in direct competition during the early stage of a case. It also causes the interests of the competing firms to diverge from the interests of the corporation and its stockholders as a whole, because the latter have no reason to sue prematurely and every reason to proceed deliberately.[1]

---

[1] *See Pyott I*, 46 A.3d at 337–38. The Delaware Supreme Court has stated the interests of competing law firms and their stockholder plaintiffs do not diverge during the early stage of the case because of the legal truism that all of the competitors are seeking to pursue the corporation's claims. *California State Teachers' Ret. Sys. v.*

Another consideration is the risk that a fast or faster-filing firm will file an insufficiently developed complaint that leads to a Rule 23.1 dismissal. Before Delaware courts could weigh in on the effect of a Rule 23.1 dismissal, a majority of federal courts concluded that a dismissal as to one stockholder precludes any other stockholder from asserting the same or similar derivative claims on the theory that all stockholders are in privity for purposes of asserting the corporation's claims. *See Pyott I*, 46 A.3d at 327 (collecting cases). Although technically the issue remains open in Delaware, the Delaware Supreme Court has signaled its agreement with propositions that undergird the federal view.[2] Counsel who want to proceed diligently

---

*Alvarez*, 179 A.3d 824, 847 (Del. 2018) ("[W]hen multiple derivative actions are filed (in one or more jurisdictions), the plaintiffs share an identity of interest in seeking to prosecute claims by and in the right of the same real party in interest—*i.e.*, as representatives of—the corporation."). The on-the-ground reality is different.

[2] *E.g.*, *Alvarez*, 179 A.3d at 855 (giving preclusive effect to federal court dismissal of derivative action under Rule 23.1 based on preclusion principles under Arkansas law); *Pyott v. Louisiana Mun. Police Empls. Ret. Sys.*, 74 A.3d 612, 616 (Del. 2013) (giving preclusive effect to federal court dismissal of derivative action under Rule 23.1 based on preclusion principles under federal law). For reasons that I have explained at length elsewhere, I continue to believe that giving preclusive effect to a dismissal under Rule 23.1 is erroneous as a matter of preclusion doctrine, corporate law, and due process.

That outcome is erroneous as a matter of preclusion doctrine because a Rule 23.1 dismissal only addresses an issue of standing and is not a final judgment on the merits. It is also erroneous as a matter of preclusion doctrine because stockholders cannot be in privity through the corporation for purposes of a Rule 23.1 dismissal. The determination establishes that the putative stockholder plaintiff lacked authority to assert the corporation's claims. It seems contradictory to hold that the same stockholder plaintiff had authority to bring the corporation's claims for purposes of privity and the preclusive effect of that decision, when the decision itself held precisely the opposite.

That outcome is erroneous as a matter of corporate law, because a derivative action is two suits combined in one. It has an initial phase in which a stockholder seeks authority to assert the corporation's claims, then a second phase in which the stockholder (after having gained authority) asserts the corporation's claim. The decisional foundation that the federal courts built on when constructing the Rule 23.1 preclusion edifice addressed the corporation's claims during the second phase. Although no Delaware decision had ruled on this issue before the accretion of federal precedent, there was a strong indication that knowledgeable Delawareans did not think a Rule 23.1 dismissal was preclusive. That indication was Rule 15(aaa), which states that a Rule 23.1 dismissal with prejudice under that rule only binds the named plaintiff. In a world of preclusion, that statement makes no sense.

The preclusion outcome is erroneous under principles of due process because the dismissal binds non-parties without sufficient basis. To reiterate, the Rule 23.1 dismissal holds the stockholder plaintiff lacks authority to assert the corporation's claims. That should mean that the plaintiff has no ability to bind non-party stockholders to the outcome reached in that decision, precisely because the vehicle for binding non-party stockholders is the corporation, and the court has just held that the plaintiff had no authority to represent the corporation. No other basis for binding non-party stockholders exists.

I would add that a one-strike-and-everyone's-out preclusion rule is bad policy because of the incentives it creates for plaintiffs' lawyers. If derivative actions perform an important role—and our law claims to believe that, *see, e.g.*, *Bird v.* Lida, 681 A.2d 399, 403-03 (Del. Ch. 1996) (Allen, C.)—then we should strive to improve the mechanism and address its weaknesses. That means taking steps to minimize agency costs and other conflicts of interest. The preclusion rule exacerbates them.

This footnote has touched on these points only briefly. For more extensive discussions, see *In re Wal-Mart Stores, Inc. Del. Deriv. Litig.*, 167 A.3d 513 (Del. Ch. 2017); *In re EZCorp Inc. Consulting Agreement Derivative Litigation,* 130 A.3d 934 (Del. Ch. 2016); *South v. Baker*, 62 A.3d 1 (Del. Ch. 2012); and *Pyott I.* For scholarly critiques of the preclusion rule, see Alice Hong, *The Case for Do-Over Derivative Shareholder Suits in Delaware Chancery Court*, 94 N.Y.U. L. Rev. 1284 (2019); and George S. Geis, *Shareholder Derivative Litigation and the Preclusion Problem*, 100 Va. L. Rev. 261 (2014).

I acknowledge that the Delaware Supreme Court in *Alvarez* reached different conclusions when discussing these points for purposes of applying Arkansas law. *See Alvarez*, 179 A.3d at 847 (holding that even though a stockholder only litigates its own right to assert claims on behalf of the corporation in the first phase of a derivative action, that fact "does not transform a stockholder's standing to sue on behalf of the corporation into an individual claim belonging to the stockholder" because "[t]he

14

therefore must always be on the lookout for other firms attempting early breakaways, Any one of those breakaways could force the entire peloton out of the race.

Under a multi-jurisdictional system that combines the dynamics of first-to-file leadership selection with one-strike-and-everyone's-out preclusion risk, plaintiffs' lawyers must navigate between the Scylla of filing too early and the Charybdis of filing too late. On too many occasions, they don't make it through the straits. Weak claims get filed that never should have reached the courthouse, or strong claims get precluded because someone jumped the gun.

To their credit, plaintiffs' counsel in this case avoided those dangers. Neither team rushed to sue. Both sought and obtained books and records. Both researched public sources. Both took the time to prepare detailed complaints.

Three of the firms in the BLBG Team—Bernstein Litowitz, Labaton, and Friedman Oster—sought books and records, although seemingly not on behalf of the Cayman/Swedish Funds. They made their demands in February 2022, after the complaint in the Dominion action survived a motion to dismiss. That was a bit early, because it remained an open question whether the Company would suffer a corporate trauma. But when to start investigating claims is a matter of judgment, and the

---

named plaintiff, at this stage, only has standing to seek to bring an action by and in the right *of the corporation* and never has an individual cause of action" (emphasis in original)); *id.* at 848 (finding federal precedents on privity persuasive); *id.* at 851–52 (finding due process satisfied because of privity, the named plaintiff's understanding that it was suing derivatively, and the fact that the named plaintiff did not litigate so egregiously poorly as to put "the opposing party on notice of facts making the failure apparent"). To state the obvious, the Delaware Supreme Court's views prevail over my own.

BLBG Team members did not act unreasonably. Over the next year, they pressed for additional materials, including documents concerning corporate policies, the authority and responsibilities of board committees, and the ethics and compliance programs. It is not clear what Kessler Topaz or Robbins Geller did during this time.

The Friedlander Team was more circumspect. They waited until after the Company actually suffered a corporate trauma in December 2022. By not starting earlier, the Friedlander Team avoided imposing costs on the Company unnecessarily. The Friedlander Team served a books and records demand on behalf of the NYC Funds on March 30, 2023 and a demand on behalf of the Oregon Funds on May 31, 2023. They synthesized the documents they received with the extensive information that was publicly available, much of which was generated by the Dominion litigation and posted on a Dominion website.

Both teams thus proceeded responsibly. This factor slightly favors the Friedlander Team, but not to a meaningful degree.

E.     **The Proposed Leadership Structure**

Rule 23.1(c)(3)(B)(v) calls on the court to consider counsel's proposed leadership structure. To quote Chancellor McCormick paraphrasing the great Knute Rockne, "you play not your eleven best, but your best eleven." *Ryan v. Mindbody, Inc.*, 2019 WL 4805820, at *4 (Del. Ch. Oct. 1, 2019). When you don't have to play eleven, you should strive for an optimal team.

On this issue, the Friedlander Team's proposal is superior. The Friedlander Team consists of three firms. That is not too cumbersome a number. Having three firms also enables the team to combine the Friedlander firm's deep expertise in

Delaware law with the more diverse competencies of Cohen Millstein and Lieff Cabraser.

The differences among the three firms and their practices suggest that the Friedlander Team can harness the benefits of diversity, which "is the most powerful method of becoming more innovative." Michael Muthukrishna, *A Theory of Everyone* 153 (2023). Research shows that cognitively diverse groups find solutions faster, and higher cognitive diversity correlates with better performance overall. *See* Alison Reynolds & David Lewis, *Teams Solve Problems Faster When They're More Cognitively Diverse*, Harv. Bus. Rev. (Mar. 30, 2017). But diversity can be a paradox, because while "[t]he most innovative teams are more diverse, [] so are the least innovative teams." Muthukrishna, *supra*, at 153. "Without a common understanding, common goals, and common language, the flow of ideas . . . is stymied." *Id.*

At the hearing on the lead counsel application, the Friedlander Team explained how their team offers a diverse group of lawyers with complementary skill sets, specialties, and backgrounds, who can collaborate effectively to achieve results. The Friedlander firm is a four-lawyer, Delaware-based firm with unsurpassed expertise litigating issues of Delaware law and practicing in this court. The Friedlander firm has particular experience with oversight claims, having served as lead counsel in *In re The Boeing Co. Derivative Litigation*, No. 2019-0907-MTZ (Del. Ch.), which settled last year for $237.5 million and governance reforms. Cohen Milstein brings a different skill set. It is a large, multi-office plaintiffs' firm with attorneys who specialize in many areas, including a strong practice in securities law. Lieff Cabraser adds yet

17

another dimension. It is a large, diversified, multi-office plaintiffs' firm that has secured significant results in a range of cases, including litigation against Volkswagen over its "Clean Diesel" emissions fraud, litigation on behalf of a group of attorneys general against tobacco companies, litigation to recover assets for Holocaust victims, and litigation against Walmart for employment-related practices. The Lieff Cabraser firm has a significant securities law practice and worked with the Friedlander firm on the *Boeing* case, but its principal victories have been in other areas. There is ample basis for synergies here.

While all three members of the Friedlander Team have never joined forces on a single case, the team's backstory suggests that they can function effectively. The NYC/Oregon Funds agreed to work together several months ago. Acting on behalf of the funds, the government officials who oversee the Oregon Funds requested proposals from outside counsel. After reviewing the proposals, they selected the Friedlander Team. The NYC/Oregon Funds have already negotiated an engagement letter with the Friedlander Team that includes a structure for any eventual fee application. The Friedlander Team thus resulted from an organized, intentional, and client-driven process.

The BLBG Team, by contrast, seems more like a committee of the willing that the lawyers assembled on the fly. It comprises five firms—not too many, but still a more cumbersome group than the Friedlander Team. Two of the three proposed co-lead firms—Bernstein Litowitz and Robbins Geller—are the Athens and Sparta of the plaintiffs' securities bar, an analogy that holds for their relative dominance and

18

for their inter-firm rivalry. How well they can work together is an open question: Would it be the Persian War or the Peloponnesian? The third proposed co-lead firm is Kessler Topaz, also a securities law specialist. So is Labaton, one of the two firms that would serve as additional counsel. So is Friedman Oster, a small, four-lawyer firm. Not a lot of apparent cognitive diversity. More like redundant capabilities.

Like the Friedlander Team, the BLBG Team as a whole has never joined forces on a case. Unlike with the Friedlander Team, the BLBG Team does not have a coherent backstory that explains how they came together. For example, it is not clear when Kessler Topaz and Robbins Geller appeared. Nor is it clear how or why Labaton and Friedman Oster, who initially showed up with Bernstein Litowitz, got bumped to additional counsel.

Perhaps more significantly, it is not clear how the five firms ended up representing the Cayman/Swedish Funds. It seems unlikely that the two funds would have set out to hire all five firms. The BLBG Team submitted a declaration from the Cayman/Swedish Funds, prepared at a time when there were two Swedish funds interested in serving as lead counsel. That declaration speaks at a high level about the funds' willingness to serve as lead plaintiffs and their understanding of their duties, but it seems formulaic. After executing it, one of the Swedish funds withdrew. The BLBG Team has not entered into a detailed engagement letter with the Cayman/Swedish Funds. At oral argument, counsel represented that the BLBG Team had discussed compensation structures with their clients only to the extent of agreeing that they will apply to the court for a fee award.

One team came together in an intentional, thoughtful, and client-centered way. The other team seems to have just come together. The comparison between the leadership structures strongly favors the Friedlander Team.

## F.    The Lead Plaintiffs

Rule 23.1(c)(3)(B)(vi) calls on the court to consider "the derivative plaintiff's relationship to and interest in the entity," and Rule 23.1(c)(3)(B)(vii) calls on the court to consider "any conflicts between counsel or the derivative plaintiff and the entity." Rule 23.1(c)(3)(B)(viii) calls on the court to consider "any other matter pertinent to ability of counsel or the derivative plaintiff to fairly and adequately represent the interests of the entity in the derivative action." In this case, those factors require examining the proposed lead plaintiffs themselves.

All of the proposed derivative plaintiffs only have a relationship with the Company in their capacity as stockholders. No one has an additional relationship, such as competitor, creditor, customer, or present or former director, officer, or employee. If another relationship existed, the court would consider it.

For a stockholder, an important dimension of the relationship is the size of the stake. Too small a stake "may reduce a stockholder's incentive to monitor counsel, leading to greater agency costs." *Ryan*, 2019 WL 4805820, at *2.

The relative size of the applicants' stakes is also important. This factor "is not used to generate a formalistic ranking, but rather comes into play when a plaintiff owns a sufficient stake to provide an economic incentive to monitor counsel and play a meaningful role in conducting the case." *In re Revlon, Inc. S'holders Litig.*, 990 A.2d 940, 955 (Del. Ch. 2010). The court does not "simply add up the number of shares and

20

select the plaintiff with the largest absolute representation." *Wiehl v. Eon Labs*, 2005 WL 696764, at *3 (Del. Ch. Mar. 22, 2005).

The court can consider the size of a plaintiff's stake both in absolute terms and relative to other factors, such as assets under management. A stake that is larger in absolute terms may be less significant to a large holder than a stake that is smaller in absolute terms but more significant to that investor's portfolio. *See In re Facebook, Inc. Deriv. Litig.*, 2021 WL 4552158, at *2 (Del. Ch. Oct. 5, 2021).

Framed in absolute terms, the NYC/Oregon Funds have a collective stake worth $32.9 million. The Cayman/Swedish Funds have a collective stake worth $47.6 million. Both are sizable stakes. The Cayman/Swedish Funds' stake is bigger, but not to such a degree as to weigh heavily in the analysis.

Framed as a percentage of assets under management, no one has a significant interest. Company shares make up 1.8% of AUM for the Cayman Fund, 0.01% for the Swedish fund, 0.01% for the NYC Funds, and less than 0.01% for Oregon Funds. The BLBG Team understandably emphasizes the Cayman Fund's percentage, proclaiming that it is "over ***150 times greater than NYC/Oregon***." And if nothing else distinguished the funds, that might suggest that the Cayman Fund would engage in more meaningful monitoring.

In this case, however, there are other reasons to think that the NYC/Oregon Funds will be more effective monitors, which is a segue to considering additional characteristics of the proposed lead plaintiffs. Both negative and positive attributes are relevant. Rule 23.1(c)(3)(B)(vii) calls out "any conflicts" with the entity, which is

21

a negative factor. Positive factors could include a particular plaintiff's experience acting as a fiduciary, skill at monitoring, or expertise that could assist the team.[3]

The NYC/Oregon Funds have substantial internal resources that they can use to support the Friedlander Team and monitor counsel's efforts. The NYC Funds fall under the purview of the New York City Comptroller, who is the chief financial officer of New York City. The Comptroller and his department have obvious financial expertise. The Comptroller's Office also includes a Corporate Governance and Responsible Investment Group with expertise in corporate governance. Two attorneys in the Affirmative Litigation Division of the Law Department of the City of New York supervise the lawsuits that the NYC Funds bring. The Oregon State Treasurer and the Oregon Department of Justice are also committed to the case, and they too can provide legal and financial support. With those capabilities, the NYC/Oregon Funds operate at a level above typical institutional investors. *See In re The Boeing Co. Deriv. Litig.*, Cons. C.A. No. 2019-0907-AGB (Del. Ch. Aug. 3, 2020) (ORDER) (emphasizing the "unique internal resources" that one of the NYC Funds could bring to the case).

In addition, the New York City Comptroller, the Oregon Attorney General, and

---

[3] The example of Herbert Chen illustrates how a named plaintiff can contribute substantially to the success of a litigation team. *See Chen v. Howard-Anderson*, 2017 WL 2842185, at *5 (Del. Ch. June 30, 2017) (describing Chen's contributions in conjunction with approving counsel's recommended incentive award of $1 million, which was deducted from counsel's fee); Charles R. Korsmo & Minor Myers, *Lead Plaintiff Incentives in Aggregate Litigation*, 72 Vand. L. Rev. 1923, 1938–39 (2019) (describing Chen's contributions and the reputational risks he faced).

the Oregon State Treasurer are public officials charged with overseeing the funds committed to their care. Their involvement lends additional legitimacy to the lawsuit. They are not so-called "private attorneys general" who have voluntarily taken up the litigation cudgel on behalf of stockholders or a corporation in pursuit of profit. There is a real attorney general, plus two other important public officials.

To cite that difference is not to suggest that public officials are always better and private stockholders worse. There are tradeoffs.[4] From the standpoint of monitoring and the legitimacy of pursuing a lawsuit, the involvement of the public officials in this case seems like a net positive.[5]

---

[4] *See* John C. Coffee, Jr., *Rescuing the Private Attorney General: Why the Model of the Lawyer As Bounty Hunter Is Not Working*, 42 Md. L. Rev. 215, 226–29 (1983) (describing tradeoffs between public and private enforcement). *Cf.* Samuel Issacharoff, *Litigation Funding and the Problem of Agency Cost in Representative Actions*, 63 DePaul L. Rev. 561, 581–82 (2014) (describing oversight mechanism in Class Action Fairness Act of giving notice to state attorneys general; noting "the inherent tension between the duties of a class representative to protect zealously the interests of absent class members and the broader constituent concerns of public officials."); Margaret H. Lemos, *Aggregate Litigation Goes Public: Representative Suits by State Attorneys General*, 126 Harv. L. Rev. 486, 513–14 (2012) (discussing conflicts of interest that attorneys general can face when bringing *parens patriae* litigation, including conflicts between "the interests of the *parens patriae* group" and "the other state interests he is charged with promoting"). Here, the role of lead counsel as the principal actor mitigates the conflicts of interest that the public officials face. Under our law, lead counsel is the ultimate decision maker and, while counsel should consider client directives, counsel can disregard those directives, even on major decisions like settlement. *See In re M & F Worldwide Corp. S'holders Litig.*, 799 A.2d 1164, 1174–75 (Del. Ch. 2002). Counsel's contingency fee arrangement gives them a financial incentive to pursue the maximum recovery for the Company.

[5] *Cf. Iron Workers Loc. No. 25 Pension Fund v. Credit-Based Asset Servicing & Securitization, LLC*, 616 F. Supp. 2d 461, 467 (S.D.N.Y. 2009) (favoring lead plaintiff where client representatives were attorneys in state attorney general's office). Demonstrating that judges generally favor suits brought by public officials over litigation by private plaintiffs, courts have declined to certify private class actions

23

The Cayman/Swedish Funds are institutional investors. Having institutional investors serve as plaintiffs is beneficial, and the Cayman/Swedish Funds are to be commended for being willing to serve. But the Cayman/Swedish Funds lack the type of expertise and institutional legitimacy that the NYC/Oregon Funds bring.

It is also questionable how involved the Cayman/Swedish Funds have been to date. They submitted a declaration saying that they met with counsel, understood their obligations as lead plaintiffs, and intended to fulfill them, but the declaration seemed canned. That declaration cannot outweigh what the NYC/Oregon Funds can provide and their greater involvement in the case to date.

---

when a state attorney general has brought suit and achieved a settlement. *See, e.g., Thornton v. State Farm Mut. Auto Ins. Co., Inc.*, 2006 WL 3359482, at *1, *3, *5 (N.D. Ohio Nov. 17, 2006) (denying class certification in view of defendant's settlement with multiple states' attorneys general, and reasoning that "[p]roceedings by the state . . . are presumably taken with the best interests of state residents in mind."); *Brown v. Blue Cross & Blue Shield of Mich., Inc.,* 167 F.R.D. 40, 42 n.2, 44 (E.D. Mich. 1996) (denying class certification in light of settlement agreement with attorney general); *Sage v. Appalachian Oil Co.*, 1994 WL 637443, at *1–2 (E.D. Tenn. Sept. 7, 1994) ("[T]he State, through the Attorney General, is clearly in a superior position to bring a *parens patriae* action . . . on behalf of all natural persons in this state. . . . [T]he State should be the preferred representative of a class of all persons, including non-natural persons such as business entities."); *Pennsylvania v. Budget Fuel Co.*, 122 F.R.D. 184, 186 (E.D. Pa. 1988) ("As a practical matter, there is no need to have a second class representative when the class is adequately represented by the Attorney General."). Although not raised by the parties, there is also an interesting parallel to visitorial powers. *See, e.g.*, Judge Glock, *The Forgotten Visitorial Power: The Origins of Administrative Subpoenas and Modern Regulation*, 37 Rev. Banking & Fin. L. 205, 226–27 (2017). *Cf.* 8 *Del. C.* § 284(a) ("Upon motion by the Attorney General, the Court of Chancery shall have jurisdiction to revoke or forfeit the charter of any corporation for abuse, misuse or nonuse of its corporate powers, privileges or franchises.").

24

The BLBG Team responds that the involvement of public officials is a negative, not a positive, because officials who hold elected positions may make decisions for political reasons, rather than in the best interests of the Company and its stockholders. They particularly criticize the NYC Comptroller, claiming that there is "long-standing and public antagonism" between him and the Company. They identify public statements that the NYC Comptroller and the Oregon public officials have made and contend that those statements create the potential for unnecessary distractions.

The BLBG Team is right to raise these considerations, but they do not outweigh the strengths of the NYC/Oregon Funds. True, the NYC Comptroller and the Oregon public officials have made public statements about their claims, but it seems unlikely that this litigation can avoid media distractions. The case involves one of the major American news networks, one of the world's largest media companies, and one of the world's richest families. In a case where media scrutiny is inevitable, having lead plaintiffs who are public figures and who have experience with the media is a benefit, not a detriment.

The BLBG Team is also almost certainly correct that "[i]f NYC/Oregon are appointed to lead this case, Defendants will seek discovery and develop a complete factual record concerning these issues, and raise them at a later stage to the potential detriment of this litigation." If there are depositions of the NYC Comptroller, the Oregon Attorney General, or the Oregon Treasurer (and at present I express no view either way as to whether those depositions should happen), then the questioning will

25

be longer than if the officials had not spoken about the case.

What seems unlikely at present is that the officials' comments could give rise to a unique defense or disqualifying conduct under the relatively lenient standards that govern the adequacy of a derivative plaintiff.[6] By suing in a representative capacity, "the named plaintiffs gave up the right to dictate the outcome of the action unilaterally." *M & F Worldwide*, 799 A.2d at 1174. Lead counsel is the main player in a derivative action, to the point that "counsel in a derivative and/or class action may present a proposed settlement over the objections of the named plaintiffs." *Id.* at 1176. Lead counsel are properly incentivized to obtain the best possible recovery for the Company.

Regardless, if it should turn out that the NYC/Oregon Funds (or the Friedlander Team) fall short of their obligations, then that can be remedied. The selection of a leadership team at the outset of the case is not a one-time event that gives the team a property right to pursue the litigation. "If a derivative plaintiff or derivative counsel fails to adequately represent the interests of the entity in pursuing the derivative action, then the Court may dismiss the derivative action without prejudice, replace the derivative plaintiff or derivative counsel, or make further

---

[6] *See generally Buttonwood Tree Value P'rs, L.P. v. R. L. Polk & Co., Inc.*, 2022 WL 2255258, at \*10 (Del. Ch. June 23, 2022); *New Jersey Carpenters Pension Fund v. infoGROUP, Inc.*, 2013 WL 610143, at \*4 (Del. Ch. Jan. 17, 2013); *In re Fuqua Indus., Inc. S'holder Litig.*, 752 A.2d 126, 132 (Del. Ch. 1999). That is my sense based on the present record. If the defendants bring a motion challenging the ability of the NYC/Oregon Funds to serve as derivative plaintiffs, then I will consider their application based on the arguments and evidence that they present.

26

orders as warranted." Ct. Ch. R. 23.1(c)(4).

Ultimately, this is a decision that involves tradeoffs. The NYC/Oregon Funds have unique attributes. On the positive side of the ledger, they bring resources and expertise, an institutional commitment to the litigation, and the legitimacy of public officials doing their jobs. On the negative side, there are potential complexities of the type that the BLBG Team has cited. In my judgment, the former outweighs the latter.

## III.     CONCLUSION

Deciding between the competing leadership applications is difficult. After taking all of the Rule 23.1 factors into account, I find that the Friedlander Team and the NYC/Oregon Funds are best qualified to lead this case. An implementing order will be entered.